**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ALTERNATIVE FINANCE, INC., and BROOKFIELD MANAGEMENT COMPANY, on Behalf of Themselves and All Others Similarly Situated, | Civil Action No.: |
| Plaintiffs, | |
| v. | |
| FAIR ISAAC CORPORATION, | |
| Defendant. | CLASS ACTION COMPLAINT JURY TRIAL DEMANDED |

# TABLE OF CONTENTS

I.     NATURE OF ACTION ................................................................................................ 1

II.    PARTIES ..................................................................................................................... 5

III.   JURISDICTION AND VENUE ................................................................................ 7

IV.   ALLEGATIONS OF FACT SUPPORTING PLAINTIFFS' CLAIMS FOR RELIEF .......... 7

     A.    Credit Scores ................................................................................................... 7

     B.    The Markets for Credit Scores ....................................................................... 9

     C.    Fair Isaac Has a Monopoly in the Business Market for Credit Scores ....................... 13

     D.    Attempts to Compete in the Business Market for Credit Scores Have Not Affected Fair Isaac's Monopoly ..................................................................... 14

     E.    Fair Isaac Contracted with the Credit Bureaus to Carry Out its Anticompetitive Scheme to Maintain and Expand its Monopoly in the Business Market for Credit Scores .................................................................... 17

     F.    Fair Isaac Entered into Anticompetitive Contract Terms with the Credit Bureaus that Restrict the Credit Bureaus' Ability to Compete and Sell VantageScore or Any Other Competing Product ............................................... 19

         a.    The Anticompetitive Agreements Restrict the Major Credit Bureaus' Ability to Develop or Sell VantageScore and Any Other Credit Score Compatible with Business-Customers' Existing Systems ....................... 19

         b.    Fair Isaac and the Credit Bureaus Have Agreed to a Penalty Pricing and Bundling Scheme to Foreclose Competition from VantageScore Solutions and Other Competitors in the Business Market for Credit Scores ............... 21

         c.    Fair Isaac and the Credit Bureaus Have Agreed to Contract Provisions that Allow Fair Isaac to Extract Monopoly Prices ....................... 23

     G.    Fair Isaac's Other Anticompetitive and Exclusionary Conduct ................................. 24

     H.    Fair Isaac's Anticompetitive Conduct Harms Competition and Enabled Fair Isaac to Charge Supracompetitive Prices for Business Credit Scores ....................... 26

V.     CLASS ACTION ALLEGATIONS ........................................................................ 27

VI.    STATUTES OF LIMITATION AND TOLLING ..................................................... 30

VII.   CLAIMS FOR RELIEF ........................................................................................... 32

         VIOLATIONS OF STATE ANTITRUST LAWS ............................................... 36

         VIOLATIONS OF STATE CONSUMER PROTECTION LAWS ..................... 64

VIII.   PRAYER FOR RELIEF ........................................................................................... 79

Plaintiffs Alternative Finance, Inc. and Brookfield Management Company, on behalf of themselves and all others similarly situated, seek treble damages and injunctive relief to redress injuries to competition caused by the Fair Isaac Corporation ("Fair Isaac") in the national market for credit scores. Fair Isaac has maintained a monopoly share in excess of 90% of that market by suppressing competition and inhibiting innovation in it. Fair Isaac's anticompetitive behavior has forced businesses like Plaintiffs to pay artificially inflated prices for credit scoring services, generating millions of dollars in supra-competitive annual revenues for Fair Isaac. Plaintiffs bring this suit on behalf of themselves individually and on behalf of a plaintiff class (the "Class"), divided into various State Subclasses, consisting of all end-user business-customers that indirectly purchased a FICO Score in the Business Market for credit scores for use and not for resale from January 1, 2006 through the present in a Repealer Jurisdiction. A Repealer Jurisdiction is a state, territory, or district that has repealed the bar on indirect purchaser plaintiffs recovering under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), and includes the following: Arizona, California, District of Columbia, Florida, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin. Plaintiffs also bring this action against Defendant for injunctive relief under Sections 1 and 2 of the Sherman Act, and for treble damages under the antitrust laws, consumer protection laws, and unjust enrichment common laws of the several states, and demand a trial by jury.

## I.  NATURE OF ACTION

1.  Fair Isaac's FICO credit scores have dominated the market for nearly three decades. Fair Isaac executives have admitted that their FICO Scores—three-digit numbers based on information in a consumer's credit report—are "the 800-pound gorilla" in the market for credit

scores, "deeply embedded in the system in North America," and have "maintained a 90-plus percent market share for at least 13 years." Fair Isaac advertises that its FICO Scores are used for 90% of all lending decisions in the United States, and that Fair Isaac sells four times as many FICO Scores per year as McDonald's sells hamburgers worldwide and twice as many FICO Scores per day as Starbucks sells cups of coffee.

2.      Credit reporting agencies—often referred to as "credit bureaus" or just "bureaus"—collect, standardize, and distribute information on the credit activity of virtually every consumer in the United States. As TransUnion has stated in litigation against Fair Isaac, credit bureaus are direct purchasers of Fair Isaac's FICO Scores; they directly purchase the scores as part of the credit reporting services they provide to millions of lenders, financial institutions, landlords, employers, and other businesses that use credit reports to determine a counterparty's credit history and/or default risk. Many such institutions also provide to their consumers FICO Scores that the institutions have purchased from Fair Isaac. The credit bureaus have entered into agreements with Fair Isaac to distribute Fair Isaac's dominant FICO Scores. Fair Isaac uses these distribution agreements to place anticompetitive restrictions on the credit bureaus' ability to develop their own competing credit scores and to distribute other competing credit score offerings, including by prohibiting the credit bureaus from developing or offering alternative credit scoring products that would allow businesses to purchase a credit scoring alternative to FICO Scores without engaging in costly reprogramming of their own systems. Furthermore, Fair Isaac imposed terms under which any lower price for FICO Scores that any one credit bureau negotiates is automatically available to all other credit bureaus, which dramatically (i) reduces the value to any one credit bureau of obtaining lower FICO Score prices and (ii) increases the costs to Fair Isaac of agreeing to lower FICO Score prices for any credit bureau—thus keeping FICO Score prices artificially high across

the board. In addition, Fair Isaac has hobbled any attempt to introduce competition into the market for credit scores by charging discriminatory royalty prices for FICO Scores if a credit bureau bundles a competing credit score with a FICO Score.

3. Plaintiff Alternative Finance, Inc. is a financial services company that indirectly purchases Fair Isaac's FICO Scores through each of the three major credit bureaus. The credit bureaus sell FICO Scores to Alternative Finance, Inc. pursuant to agreements between Fair Isaac and each credit bureau, which provide for royalty payments to be paid to Fair Isaac for each FICO Score sold to Alternative Finance. The credit bureaus pass on to Alternative Finance and other business-customers the royalty cost of each FICO Score.

4. Plaintiff Brookfield Management Company is a real property management company that indirectly purchases Fair Isaac's FICO scores through contracts with a third party tenant screening services provider which, in turn, purchases credit screening services from one of the three major credit bureaus. The credit bureau and tenant screening services provider sell FICO Scores to Brookfield Management Company pursuant to agreements between Fair Isaac and each credit bureau, which provide for royalty payments to be paid to Fair Isaac for each FICO Score sold to Brookfield Management Company. The credit bureaus and third-party services providers pass on to Brookfield Management Company and other business-customers the royalty cost of each FICO Score.

5. In 2006, VantageScore Solutions, LLC ("VantageScore Solutions"), an independent joint venture of the three major credit bureaus— Equifax, Experian, and TransUnion—launched VantageScore, a credit score to compete against Fair Isaac's FICO Scores. VantageScore Solutions, like Fair Isaac, uses scoring codes and algorithms to convert the information contained in a consumer credit report into a credit score. VantageScore presented a competitively-priced

alternative to FICO Scores. Unlike FICO Scores, VantageScore Solutions accounts for consumers' rental and utility payments, enabling it to provide a credit score for consumers with less than six months of credit history. VantageScore Solutions therefore provides a credit score for tens of millions more Americans than Fair Isaac's algorithms allow. If Plaintiffs and similarly situated businesses were able to purchase VantageScores on economically-sensible terms, they would be able to see credit scores of tens of millions more consumers, enabling them to contract with millions more customers, tenants, and employees than they can using FICO Scores alone.

6.      Fair Isaac has engaged in a pattern of anticompetitive conduct since 2006 designed to discourage use of VantageScores and other alternatives to FICO Scores, including by abusing its monopoly power to impose onerous contractual terms on the credit bureaus to prevent the credit bureaus from marketing and selling VantageScores or any other alternative to FICO Scores. Fair Isaac has also waged a disparaging public relations and advertising campaign to create uncertainty about the reliability of VantageScores. The purpose of FICO's anticompetitive scheme is to prevent competition on the merits with VantageScore and other scoring systems to preserve Fair Isaac's monopoly.

7.      Through its anticompetitive and exclusionary conduct, Fair Isaac succeeded in preventing VantageScore Solutions from gaining the market share it otherwise would have captured through competition on the merits. Fair Isaac's anticompetitive scheme also thwarted the entry of other entities into the market for credit scores. Having successfully suppressed all other competition, Fair Isaac increased prices for its FICO products. If it were not for Fair Isaac's suppression of competition, VantageScore Solutions and other competitors of Fair Isaac would have thrived and won substantial market share, allowing for price competition and reducing the prices Plaintiffs and similarly situated businesses paid for FICO products.

8.      Fair Isaac's anticompetitive conduct harmed Plaintiffs as end-user business-customers who indirectly purchased Fair Isaac's FICO Scores. Fair Isaac's anticompetitive conduct has similarly harmed other such indirect purchasers of Fair Isaac's FICO products, including banks, credit unions, insurance companies, car dealers, retailers, telecommunications companies, landlords, property management companies, employers, and other entities that rely on credit scores to assess creditworthiness, manage risk, and make business decisions.

9.      Plaintiffs and other similarly situated business-customers of FICO Scores are indirect purchasers of Fair Isaac's FICO Scores. They do not purchase FICO Scores directly from Fair Isaac itself. Credit bureaus and a small number of large businesses, including several large banks, purchase credit scores from Fair Isaac directly. For example, the credit bureau TransUnion is a direct purchaser of FICO scores, as it has pled in litigation against Fair Isaac in the federal court for the Northern District of Illinois (*Fair Isaac Corp. v. Trans Union LLC*, No. 1:17-cv-08318). These businesses are not similarly situated to Plaintiffs because they are direct purchasers of FICO Scores.

10.     Fair Isaac's anticompetitive conduct harmed competition in the Business Market for credit scores.  Opening the Business Market for credit scores to competition is essential to spurring innovation so that credit scores are fairly priced, more accurate, and score the tens of millions of creditworthy Americans denied access to credit under Fair Isaac's model.

## II.   PARTIES

11.     Plaintiff Alternative Finance, Inc. is a financial services company located in East Greenwich, Rhode Island. Alternative Finance provides financial services, including the financing of long-term rentals of gym and security equipment. Alternative Finance indirectly purchases Fair Isaac's FICO Scores through each of the three major credit bureaus. The credit bureaus sell FICO

Scores to Alternative Finance, Inc. pursuant to agreements between Fair Isaac and each credit bureau, which provide for royalty payments to be paid to Fair Isaac for each FICO Score sold to Alternative Finance. The credit bureaus pass on to Alternative Finance and other business-customers the royalty cost of each FICO Score.

12.     Plaintiff Brookfield Management Company is a real property management company located in Farmington Hills, Michigan. Brookfield Management indirectly purchases Fair Isaac's FICO scores through contracts with a third-party tenant screening services provider which, in turn, purchases credit screening services from one of the three major credit bureaus. The credit bureau and tenant screening services provider sell FICO Scores to Brookfield Management Company pursuant to agreements between Fair Isaac and each credit bureau, which provide for royalty payments to be paid to Fair Isaac for each FICO Score sold to Brookfield Management Company. The credit bureaus and third-party services providers pass on to Brookfield Management Company and other business-customers the royalty cost of each FICO Score.

13.     During the Class Period, Plaintiffs purchased credit scores indirectly from Fair Isaac.

14.     Plaintiffs were injured in their business or property as a direct, proximate, and material result of Defendant's violation of law.

15.      Defendant Fair Isaac is a Delaware corporation, with its principal place of business at 181 Metro Drive, Suite 700, San Jose, California, 95110.

16.     Plaintiffs bring this state law class action on behalf of the Class to recover actual and/or compensatory damages, double and treble damages as permitted, pre- and post-judgment interest, costs, and attorneys' fees for the injuries caused by Defendant's conduct in restricting the development and sale of credit scores and causing the prices of its own FICO Scores to be artificially inflated. Plaintiffs also seek injunctive relief under Sections 1 and 2 of the Sherman Act.

6

### III.    JURISDICTION AND VENUE

17.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a) and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26. This Court possesses supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

18.    Defendant Fair Isaac is subject to the personal jurisdiction of this Court pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, because, among other reasons, it regularly transacts business within the State of Illinois.

19.    Venue is proper in this District pursuant to, among other statutes, Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b) and (c). Fair Isaac regularly transacts business within this District and a substantial portion of the affected interstate trade and commerce described in this Complaint were carried out in this District.

20.    Fair Isaac markets its products across state lines and receives substantial payments across state lines. Fair Isaac's business activities that are the subject of this Complaint are within the law of, and have substantially affected, interstate trade and commerce.

### IV.    ALLEGATIONS OF FACT SUPPORTING PLAINTIFFS' CLAIMS FOR RELIEF

#### A.    Credit Scores

21.    A credit score is a numerical expression designed to represent the creditworthiness of an individual or business. Higher scores generally indicate that an individual or business poses less credit risk, or—in the case of a potential tenant, employee, or business counterparty—is more likely to make payments under a contract and to manage money responsibly. Credit scores typically are produced by applying scoring algorithms to a person's consumer credit history. Credit scores are based on an analysis of an individual's credit files and are often—although not always—based on a credit report sourced from a credit reporting agency. Credit scores usually are accompanied

7

by "reason statements," which inform the purchaser about the factors that contributed most significantly to that particular individual's credit score. Examples of reason statements include: "Account payment history is too new to rate"; "Amount owed on accounts is too high"; and "Too many recently active accounts." A number or alphanumeric code—called a "reason code"—is associated with each reason statement.

22.     Credit reporting agencies collect consumer credit data and present the aggregated information in the form of credit reports. Credit reporting agencies continually gather credit and financial data about individuals from creditors, government entities, public records, collection agencies, and other third parties, and compile this information into a credit file. The credit reporting agencies then use an individual's credit file to populate a credit report on that individual for sale to businesses and consumers. Although there are numerous credit reporting agencies in the United States, the market is dominated by three major entities: Equifax, Experian, and TransUnion.

23.     Credit scores are the most widely-used indicators of consumers' creditworthiness in the United States. They are crucial to millions of businesses that rely on indicators of creditworthiness to assess risk and make business decisions. Lenders, such as banks, credit unions, credit card companies, and car dealers, rely on credit scores to decide whether and on what terms to extend credit to consumers and small businesses. Credit scores are also crucial to other businesses that rely on indicators of creditworthiness to assess risk and make business decisions. Landlords, real estate brokers, and property management companies rely on credit scores to help determine whether to rent to prospective tenants and to negotiate real estate contracts. Insurers rely on credit scores to help determine what policy terms to offer customers. Telecommunications companies rely on credit scores to help determine what mobile phone plan terms to offer customers, including whether or not to require a deposit.

24. While credit scores are often sold together with credit reports, they are distinct products that can be sold independently. A credit report is a narrative statement that provides detailed information about a consumer's credit history and credit accounts. A credit report might, for example, include information about an individual's history of credit card balances, mortgage and utility payments, defaults, and credit inquiries. A credit score takes the information in a credit report and presents it as a single number.

### B.     The Markets for Credit Scores

25. There are two distinct markets for credit scores: (1) the "Business Market," for credit scores used by lenders, financial institutions, and other businesses to either (a) assess risk and make business decisions or (b) resell or otherwise provide to their own downstream customers; and (2) the "Consumer Market," for credit scores sold directly to consumers to monitor their own credit records.

26. In the Business Market, businesses purchase the credit scores of individuals and businesses to assess creditworthiness, manage risk, and make business decisions. The Business Market also includes the FICO Scores that Plaintiffs and other businesses indirectly purchase from Fair Isaac to provide to their customers, such as to comply with their obligations under the law— including under Section 615(h) of the Fair Credit Reporting Act, as amended by the Dodd-Frank Wall Street Reform and Consumer Protection Act, 15 U.S.C. § 1681m(h).

27. In the Consumer Market, Fair Isaac and other credit score producers—as well as the credit bureaus and other resellers—sell directly to individual consumers those consumers' own credit scores, which the consumers typically use to understand their own creditworthiness and how they are likely to be viewed by lenders.

28. The Business Market for credit scores is a distinct product market for antitrust

purposes. The businesses that use credit scores to assess creditworthiness, manage risk, and make business decisions do not consider credit reports, insurance scores, or any part of an individual's consumer and credit history to be a substitute for credit scores. Likewise, the businesses that resell or otherwise provide credit scores to their own downstream customers do not consider credit reports, insurance scores, or any part of an individual's consumer and credit history to be a substitute for credit scores.

29.     The United States is a relevant geographic market in which Business credit scores are provided. The restraints on competition contained in Fair Isaac's contracts relate to the provision of credit scores to businesses and consumers throughout the United States.

30.     The business-customers in the Business Market, which include lenders, real estate companies, insurance companies, and other businesses, are a distinct and recognizable group of purchasers of credit scores. These business-customers use credit scores differently than consumer-customers in the Consumer Market.

31.     Lenders, financial companies, real estate companies, insurance companies, and other business-customers in the Business Market use credit scores to assess creditworthiness of potential customers, to manage risk, and to make business decisions about with whom to deal and on what terms. For example, credit card companies and retailers purchase credit scores in order to identify qualified borrowers to whom a pre-approved credit card or store card offer might be extended, a practice known as "pre-screening." Banks, credit unions, and other financial institutions purchase credit scores to help determine whether to lend to a potential borrower and, if so, on what terms ("lending"), or to help review the risk associated with existing borrowers for purposes of extending additional credit or changing account terms ("account management"). Telecommunications, insurance, real estate, and property management companies purchase credit

scores to help determine whether to contract with a specific individual and, if so, on what terms ("screening").

32.     In contrast, consumer-customers in the Consumer Market use credit scores to monitor their own financial health, manage their debt, protect their identity, and assess the likelihood of obtaining credit on favorable terms.

33.     In other words, business-customers in the Business Market purchase credit scores to use them to manage, sell, advertise, or complement another product, while consumer-customers in the Consumer Market purchase the scores as an end-product in itself.

34.     Furthermore, business-customers in the Business Market can buy credit scores either individually or in batches of credit scores of multiple individuals. Business-customers in the Business Market who engage in pre-screening often purchase credit scores in bulk. For example, credit card companies often target customers through "Pre-Screening" or "Pre-Qualification" marketing efforts, which involve the purchase of credit scores in bulk in order to target groups of consumers with offers for credit cards with terms based on their credit score range. In contrast, consumer-customers in the Consumer Market purchase only one score at a time—their own score.

35.     Similarly, different businesses within one sector—such as mortgagors or auto lenders—use the same types of credit scores with similar score-to-risk relationships and reason codes as other businesses with their sector. This consistent use of particular kinds of credit scores within a sector facilitates the bundling of large groups of loans into securities to be sold to investors. The consistent use of a single type of credit score allows businesses to market such securities using data on the average and stratified credit scores of the borrows associated with the underlying loans. This type of stratifying and bundling does not occur in the Consumer Market for credit scores.

36.     While the Business Market has existed for decades, the Consumer Market is relatively new and continues to grow as more individuals become interested in seeing how their personal data is collected and used by credit reporting agencies, financial institutions, and other businesses. The Consumer Market has also experienced a recent surge of growth as widespread data breaches and instances of identity theft have incentivized individuals to monitor their credit histories for signs of identity theft.

37.     The overwhelming majority of the credit reporting and credit scoring industry, industry analysts, policy analysts, and investors recognize the Business Market as a separate market from the Consumer Market. Fair Isaac recognizes its Business and Consumer offerings as distinct product and revenue lines. Fair Isaac has divided its "Scores" profits and revenues into separate "business-to-business" or "B2B" and "business-to-consumer" or "B2C" segments in its Securities and Exchange Commission filings and shareholder calls over the last several years. In its 10-K and 10-Q filings for the past several years, Fair Isaac has distinguished between its "business-to-business scoring solutions and services" and its "business-to-consumer scoring solutions and services including myFICO solutions for consumers."

38.     The Business Market for credit scores follows a separate chain of purchases than the Consumer Market for credit scores. For decades, business-customers have purchased credit scores from Fair Isaac through one or more of the credit bureaus and/or third-party intermediaries. In exchange, the credit bureaus charge a royalty payment per credit score, which the credit bureau then passes on to Fair Isaac. The exact amount of the royalty payment paid to Fair Isaac is determined under contracts between Fair Isaac and each credit bureau. Fair Isaac has attempted to negotiate sales of credit scores directly to major credit card companies, and has succeeded with a small number of them. But the vast majority of business-customers continue to purchase credit

scores from Fair Isaac indirectly, through one of the credit bureaus and/or third-party intermediaries. Meanwhile, credit scores in the Consumer Market are often sold to consumers directly, as when consumers purchase their credit score from Fair Isaac at myFICO.com.

**C.   Fair Isaac Has a Monopoly in the Business Market for Credit Scores**

39.    Fair Isaac has maintained a monopoly over the Business Market for credit scores since as far back as 1989, largely through the dominance of its FICO product line, which includes many different types of FICO Scores.

40.    Introduced in 1989, Fair Isaac's "FICO Classic" credit scores are the best known and most widely used Business Market credit scores. Fair Isaac applies an algorithm to each credit reporting agency's data to generate a FICO Classic Score between 300 and 850 that purports to give an indication of the individual's credit risk. It also generates a set of "reason statements," with corresponding codes, that explain the reasons the consumer has not been assigned the maximum score.

41.    Fair Isaac brazenly advertises its monopoly in the Business Market. For example, Fair Isaac advertises on its website that "10 billion FICO Scores are sold each year," which, it brags, is "four times the number of hamburgers that McDonald's sells WORLDWIDE in a year." Fair Isaac also asserts that "27,400,000 FICO Scores are sold every day," which is "OVER TWICE the number of cups of coffee Starbucks sells WORLDWIDE in a day." Fair Isaac asserts that "90% of ALL lending decisions in the U.S. RELY on FICO Scores."

42.    Similarly, Fair Isaac has described its FICO Scores as the standard measure of consumer credit risk in the U.S. and reported that FICO Scores are used by nearly all of the major banks, credit card organizations, mortgage lenders, and auto loan originators.

43.    Fair Isaac representatives have described Fair Isaac's FICO Score as "the 800-

pound gorilla" in the Business Market for credit scores and have bragged about Fair Isaac's 90% market share. For example, in November 2017, at the JPMorgan Ultimate Services Investor Conference, Fair Isaac's CFO and Executive Vice President Michael Pung stated that the FICO scoring system "is the most widely used credit scoring system here in the U.S.," that "[v]irtually every major lender in the U.S. [uses] the FICO Score for some sort of credit lending decision," and that Fair Isaac has "maintained a 90-plus percent market share for at least the [last] 13 years."

44.     Fair Isaac's monopoly in the Business Market for credit scores has given it considerable power to control prices. Fair Isaac's CEO Will Lansing has noted that, in the Business Market for credit scores, Fair Isaac has significant discretion to raise or lower its margins.

**D.     Attempts to Compete in the Business Market for Credit Scores Have Not Affected Fair Isaac's Monopoly**

45.     Various entities have attempted to compete with Fair Isaac's dominant FICO Scores in the Business Market. Many of these alternatives to FICO Scores are based on the same data as FICO Scores; that is, data available through one or more of the major national credit bureaus. Many are also based in part on other data not taken into account by FICO Scores, including rental, utility, and telecom payment data and/or public records information, such as property deeds, mortgages, liens, personal property titles, tax records, and licensing data.

46.     VantageScore Solutions introduced the VantageScore credit scoring system in March 2006 to compete against Fair Isaac's FICO Scores in the Business Market. Because it was backed by the three major credit bureaus, VantageScore Solutions represented the biggest threat to the dominance of Fair Isaac's FICO Scores in the Business Market. Other would-be competitors to Fair Isaac's FICO Scores in the Business Market for credit scores include but are not limited to:

i.      SageStream's Credit Optics Score, which blends traditional and alternative credit data with machine learning modeling techniques;

14

ii.     LexisNexis's RiskView score, which is based on wide-ranging public records;

iii.    CoreLogic Credco's Anthem Credit Score, which reports on property-related public records;

iv.     PRBC, which allows consumers to self-enroll and report their own non-debt payment history;

vi.     ChexSystems, which was designed specifically for financial account verification services;

vii.    L2C's Link2Credit Score, which uses utility payment histories to determine creditworthiness; and

viii.   ScoreLogix LLC's JSS Credit Score, which assesses credit risk based on job history, income, and the impact of the economy.

47.     Because Fair Isaac's FICO scoring systems do not generate a score if a consumer does not have at least one credit account that has been open for six months or more, or if no credit account of the consumer has been reported to the reporting credit bureau, millions of otherwise creditworthy individuals do not have a FICO Score. VantageScore and other competing business-to-business credit scoring models are capable of providing reliable credit scores for millions more consumers than FICO Scores by relying on additional and alternative sources of data. VantageScore and other credit scoring models, for example, calculate scores for consumers that have not used credit for up to two years and use individuals' utility and telecommunications payment histories. In this way, VantageScore and other competing credit scoring models provide insights into individuals' and businesses' desirability as customers, clients, and/or tenants that Fair Isaac's FICO Scores cannot.

48.     Furthermore, Fair Isaac's FICO scoring model measures creditworthiness only as a function of past ability to pay. Businesses may prefer to rely on a competing credit scoring model that focuses on future ability to pay, such as L2C's credit score and Scorelogix's JSS score.

49.     Today, VantageScore scores 30 million more Americans than traditional FICO

15

Scores. Fair Isaac's outdated FICO Classic credit scoring systems—still used by many mortgage lenders—exclude many creditworthy Americans that VantageScore and other competing credit scoring models can reliably score. About one-quarter of American adults, around 65 million people, do not have a traditional FICO Score. VantageScore alone is capable of reducing the number of adults without a credit score by almost half. An estimated ten million of those individuals are "prime" borrowers who are attractive as customers, counterparties, and tenants.

50. Without a credit score, it is difficult or impossible to obtain a mortgage, car loan, or reasonable interest rates on personal lines of credit. Because credit scores are increasingly relied upon by landlords to screen potential tenants, an individuals' lack of a credit score may cost them a home. Thus, those excluded by Fair Isaac's traditional FICO scoring systems face an increased risk of being denied access to credit in the form of credit cards, auto and home loans, and apartment housing.

51. Those excluded by Fair Isaac's traditional FICO scoring systems include disproportionate numbers of low-income and minority consumers.

52. Indeed, one advocacy group focused on making it possible for people with limited incomes, especially people of color, to achieve financial security, has observed: "Black and Hispanic individuals are . . . significantly more likely than white individuals to be credit invisible" (meaning that they have "no established credit history" ) or "unscored" (meaning that they "lack[] sufficient or recent enough credit history to be given a [FICO] credit score").

53. VantageScore alone calculates a score for 9.5 million Hispanic and Black consumers who do not have a FICO Score, including an estimated 2.7 million minority consumers who should be considered "prime" borrowers.

54. Despite the advantages of using VantageScore or another competing credit scoring

model, Fair Isaac continues to have a monopoly in the Business Credit Score Market. In February 2013, at a Morgan Stanley Conference, Fair Isaac's CEO Will Lansing explained that despite the existence of VantageScore, "there [is] not that much competition around our Scores business" because "FICO Scores are very much part of the fabric of the banking industry" and "really deeply embedded."

**E.    Fair Isaac Contracted with the Credit Bureaus to Carry Out its Anticompetitive Scheme to Maintain and Expand its Monopoly in the Business Market for Credit Scores**

55.    Leveraging its dominant position in in the Business Market for credit scores, Fair Isaac has used and continues to use the credit bureaus to maintain and extend its monopoly.

56.    Fair Isaac's relationship with business-customers in the Business Market for credit scores is often dependent on business-customers' relationships with the credit bureaus. To facilitate the sale of its FICO Scores to business-customers, Fair Isaac enlists the assistance of the credit bureaus.

57.    Business-customers in the Business Market purchase credit reports and FICO Scores from one of the credit bureaus, either by dealing directly with the credit bureau or through a third-party intermediary. Contracts typically called "Credit Scoring Services Agreements" or "CSSAs" govern purchases of FICO Scores between the credit bureaus and their customers. CSSAs provide for both the method of payment and fee model for delivery of credit score services. CSSAs govern the terms by which Plaintiffs and other businesses purchase FICO Scores, including the amount(s) paid to the credit bureau, the method of payment, the mode of delivery, and restrictions on the business's use of FICO Scores.

58.    The royalties that the credit bureaus pay to Fair Isaac for the FICO Scores that the credit bureaus have sold to their customers are governed by separate contracts between the credit

bureaus and Fair Isaac. The credit bureaus and any third-party intermediary pass on these royalty costs to Plaintiffs and other business-customers.

59.     Fair Isaac has used its monopoly power to coordinate a multi-faceted campaign to eliminate competition from VantageScore and all other credit scoring alternatives to FICO. Fair Isaac has been explicit that this is its goal. In April 2015, Mr. Lansing informed investors on a quarterly earnings conference call that Fair Isaac's strategic goal was to ensure that "the entire industry adopts FICO Scores instead of [other] scores."

60.     To freeze out other credit score offerings, Fair Isaac conscripted the credit bureaus—Equifax, Experian, and TransUnion, which jointly own and control VantageScore Solutions—to agree to anticompetitive contracts that prevent them from developing or selling alternative credit scores that could be seamlessly integrated into many lenders' systems or used interchangeably with FICO Scores.

61.     The anticompetitive contracts further prohibit Equifax, Experian, and TransUnion from competing against each other to negotiate better prices from Fair Isaac, which has the effect of artificially inflating the prices that Plaintiffs and other business-customers must pay the credit bureaus for FICO Scores.

62.     The contracts also create a pricing scheme that effectively forecloses business-customers in the Business Market from choosing to use FICO Scores for internal business functions while providing a VantageScore or other alternative to FICO Scores to their customers and clients.

63.     Meanwhile, Fair Isaac has engaged in a media campaign against VantageScore and other credit scoring alternatives, including making false and misleading statements about such alternatives in order to sow doubt about VantageScore's and other credit scoring systems'

18

reliability.

64.     By its anticompetitive and exclusionary conduct, Fair Isaac inhibited competition in the Business Market for credit scores and increased prices for Plaintiffs and other similarly situated business-customers of Business Market credit scores.

### F.     Fair Isaac Entered into Anticompetitive Contract Terms with the Credit Bureaus that Restrict the Credit Bureaus' Ability to Compete and Sell VantageScore or Any Other Competing Product

65.     In January 2015, Fair Isaac and TransUnion entered into a contract, the Analytic and Data License Agreement ("ADLA"). With TransUnion's prior contracts with Fair Isaac set to expire on December 31, 2014, Fair Isaac demanded that the parties enter into a new contract rather than renewing their existing contracts. Fair Isaac represented to TransUnion that Equifax and Experian already had agreed to materially similar new contracts with Fair Isaac. If TransUnion did not agree to the terms demanded by Fair Isaac, it would lose substantial business from customers that depend on FICO Scores. On information and belief, Equifax, Experian, and TransUnion all agreed to Fair Isaac's plan to exclude competitors and maintain its monopoly.

### a.     The Anticompetitive Agreements Restrict the Major Credit Bureaus' Ability to Develop or Sell VantageScore and Any Other Credit Score Compatible with Business-Customers' Existing Systems

66.     Section 12.5 of the ADLA between Fair Isaac and TransUnion, which is labeled "No Equivalent Products," provides that TransUnion may not "internally develop" a credit scoring system that is "aligned to the odds-to-score relationship of any Fair Isaac Analytic" or uses more than a limited number of reason codes that "match" reason codes used by any Fair Isaac Analytic. Section 12.5 of the ADLA further prohibits TransUnion from distributing "any competing analytic" (*i.e.*, credit scoring system) that is aligned with FICO Scores or uses too many of the same reason codes, and it expressly names VantageScore Solutions LLC as a developer of such a scoring system

that may not be distributed if VantageScore were to offer an "Equivalent Product."

67.     On information and belief, Fair Isaac has imposed similar or identical "No Equivalent Products" clauses on Equifax and Experian. The credit bureaus have agreed to and acquiesced in these anticompetitive agreements and the resulting anticompetitive effects.

68.     By imposing a "No Equivalent Products" term, Fair Isaac has blocked the credit bureaus from offering alternative credit scoring products that would allow business-customers in the Business Market to switch from FICO Scores to VantageScores or another credit scoring system without incurring the significant switching costs that using a new scoring system otherwise would entail, or to use VantageScore or another credit scoring system alongside or interchangeably with FICO Scores without incurring those same switching costs.

69.     For example, if an alternative credit scoring product such as VantageScore used a score of 700 to indicate a less-than-five-percent risk of credit delinquency, and if a FICO Score of 700 also indicated the same risk of delinquency, the "No Equivalent Products" clause would prevent a credit bureau from distributing the competing product. Similarly, if a competing credit score product used reason codes that match 20% of the reason codes used by FICO scoring systems, the "No Equivalent Products" clause would prohibit a credit bureau from distributing the product.

70.     The "No Equivalent Products" clause effectively prohibits the credit bureaus from selling an alternative to FICO's credit scores that would be compatible with many businesses' existing systems, models, and processes and would give business-customers a legitimate choice between using FICO Scores and an alternative score. Many business-customers of credit scores have systems, models, and processes designed for FICO Scores. These business-customers' systems, models, and processes are calibrated to FICO's odds-to-score relationship (*i.e.*, each

given score has a given ratio of non-defaulting consumers to defaulting consumers), and reason codes (the particular reasons cited for increased risk of default). For example, a bank's software might be designed to accept one or more FICO Scores and reason codes, combine this information with data that it collects internally, and automatically produce a lending decision.

71.     The "No Equivalent Products" clause protects and sustains Fair Isaac's monopoly, not its intellectual property. The odds-to-score relationship is an arbitrary mapping between risk and score, and does not reflect protectable intellectual property. The intellectual property entitled to protection in this product market is the analysis and the process used to predict a consumer's risk of default, not the shorthand representation of, for example, a "less-than-five-percent-risk-of-default" as "700." Similarly, the reason codes that, under the "No Equivalent Products" clause, are not permitted to "match" Fair Isaac's, were not invented by Fair Isaac. Rather, there is an established set of reason codes that reflect well-established industry measures of creditworthiness. These clauses in Fair Isaac's contracts are akin to a dominant manufacturer of screwdrivers effectively forbidding its competitors from creating or selling screwdriver bits that match industry-standard screws.

      **b.**    **Fair Isaac and the Credit Bureaus Have Agreed to a Penalty Pricing and Bundling Scheme to Foreclose Competition from VantageScore Solutions and Other Competitors in the Business Market for Credit Scores**

72.     Certain businesses-customers in the Business Market for credit scores—including banks, credit unions, credit card companies, and retail stores—offer their consumer-customers opportunities to apply for credit (*e.g.*, a credit card, loan, or store card) and, at the same time, receive their personal credit score. The offer of a free credit score to a consumer can entice consumers to apply for credit and other opportunities with the transacting business.

73.     In 2015, Fair Isaac imposed on the credit bureaus a new "Pre-Qualification" royalty

category. Agreements between Fair Isaac and the credit bureaus define "Pre-Qualification" to "mean an End User's qualification of a potential consumer customer for an End User's own internal lending offering." This royalty category creates a distinction between: (1) lenders that use FICO Scores for "Pre-Qualification" without providing any credit score or credit data to consumers, and (2) lenders that use FICO Scores for "Pre-Qualification" and also provide credit scores or credit data to consumers "in connection" with the "Pre-Qualification." The royalty price associated with a FICO Score used for "Pre-Qualification" depends on whether other credit scores or credit data are provided to consumers. If a business-customer purchases a FICO Score for use in "Pre-Qualification" and does not provide any credit score or credit data to their consumer customer "in connection" with the "Pre-Qualification," there is one per-score royalty rate. If the business-customer purchases a FICO Score for use in "Pre-Qualification" and provides a VantageScore or any other competing credit score to the consumer "in connection" with the "Pre-Qualification," there is a different per-score royalty rate that is significantly higher—a penalty rate.

74.     The penalty rate can be avoided in one of two ways, both of which require the business-customer to purchase exclusively FICO Scores. First, the business-customer could purchase a FICO Score for use in "Pre-Qualification" and provide no credit score or credit data to the consumer. Second, the business-customer could purchase a bundled FICO product from Fair Isaac and provide the bundled FICO Score to its consumer-customer. Fair Isaac offers bundled products to lenders that combine the use of scores designed for use by business-customers with the provision of scores to their consumer-customers.

75.     There is no legitimate business justification for the penalty rate Fair Isaac demands for FICO Scores when the business-customer also purchases a competing credit score to provide its consumer-customers. The transparent purpose of the "Pre-Qualification" royalty category is to

drive all business-customers engaging in "Pre-Qualification" to purchase exclusively FICO Scores and make it cost prohibitive for business-customers engaging in pre-screening and/or "Pre-Qualification" to purchase a competing credit score for disclosure to consumers, and thus to prevent the purveyors of would-be competitors to FICO Scores from gaining the traction necessary to challenge Fair Isaac's monopoly position. This scheme has been effective, and few, if any, business-customers have opted to pay the penalty rate.

        **c.**     **Fair Isaac and the Credit Bureaus Have Agreed to Contract Provisions that Allow Fair Isaac to Extract Monopoly Prices**

76.     Section 9.2 of the ADLA between Fair Isaac and TransUnion, labeled "Dynamic Royalty Schedule," provides that "once every twelve (12) months during the Term, Fair Isaac shall have the right to replace the Royalty Schedule by providing a new royalty schedule to TransUnion in writing." Section 9.16 of the ADLA, which is labeled "Level Playing Field," requires that the prices that are made available to TransUnion be made available to the other credit reporting agencies. Taken together, Section 9.2 ("Dynamic Royalty Schedule") and Section 9.16 ("Level Playing Field") create a one-way rachet and enable Fair Isaac to unilaterally increase the royalty prices it charges TransUnion for FICO Scores. On information and belief, Fair Isaac's contracts with Equifax and Experian include similar or identical "Level Playing Field" and "Dynamic Royalty Schedule" provisions.

77.     Fair Isaac has used the "Level Playing Field" and "Dynamic Royalty Schedule" provisions in its contracts with the credit bureaus to extract monopoly prices from all business-customers in the Business Market. These provisions disincentivize each credit bureau from negotiating lower royalty prices because it knows that, even if it succeeds, it will not gain a competitive advantage over other credit bureaus as a result. This anticompetitive result is the sole intended purpose and effect of the "Level Playing Field" provision. It is not a provision that any

credit bureau would want in its own contract, and it provides Fair Isaac with no rights that it would not otherwise have—Fair Isaac could offer the same rates to all credit bureaus without the "Level Playing Field" provision. Rather, the provision exists solely to inform the credit bureaus that negotiating for lower prices is useless.

### G.     Fair Isaac's Other Anticompetitive and Exclusionary Conduct

78.     Despite having successfully induced the credit bureaus to agree to anticompetitive restrictions on the credit bureaus' ability to compete with FICO Scores or to offer any competing scoring product, Fair Isaac has taken additional steps to preserve and support its monopoly in the Business Market for credit scores. As part of its broader anticompetitive scheme to preserve and support its monopoly, Fair Isaac has waged an aggressive public relations and advertising campaign to spread false statements, convey false impressions, and mislead business-customers in the Business Market about the qualities and characteristics of FICO Scores, VantageScore, and other competing credit score products. In advertisements, letters, and blog posts, Fair Isaac disparaged VantageScore and other credit scoring systems by calling them "Fako" scores, falsely claimed that VantageScore and other alternative scoring systems do not reliably measure creditworthiness, and misrepresented the information considered by VantageScore and other credit scoring systems.

79.     On December 12, 2017, Fair Isaac took out a full-page advertisement in the *Wall Street Journal* addressed to "Lenders, Policymakers and Consumer Advocates" that disparaged VantageScore without identifying it by name. The advertisement contrasted Fair Isaac, which "is not owned by the credit bureaus" and whose FICO Scores have been used "by lenders and securitization investors for decades," with an alternative credit score, which the advertisement presented as: "owned by the credit bureaus," less reliable than FICO Scores in evaluating credit

risk, and suffering from a failure to use "sound practices" or "science-based credit evaluation." To anyone familiar with the market for credit scores, the advertisement unambiguously conveys the false message that VantageScore is "Weakening scoring standards, [and] harm[ing] consumers, and the lending system."

80.     The *Wall Street Journal* advertisement directed readers to "Learn more at FICO.com/independent," a Fair Isaac-owned website that connects visitors to articles and blog posts that disparage VantageScore by name. One such blog post asserts: "Despite claims by VantageScore, weakening the minimum scoring criteria will not empower millions of low-risk mortgage credit seekers."

81.     Fair Isaac's public website includes numerous posts disparaging VantageScore and other credit scoring products and making false or misleading statements about those products' features. For example, one blog post claims that "Research results consistently showed that scoring models relying solely on sparse or old credit data were weak and did a poor job forecasting future performance." This statement is false and misleading; it conveys the false message that VantageScore and other competing scoring models are "weak" and do a "poor job forecasting future performance" because they consider an individual consumer or business's full credit and financial history, even if the consumer has not used a traditional credit line in the last six months. In fact, studies have shown that VantageScore and other competing credit scoring models are strongly predictive.

82.     Fair Isaac's media and advertising campaign against VantageScore has been successful in sowing fear, uncertainty, and doubt about credit scoring alternatives in the marketplace. Media sources, financial blogs, and consumers have absorbed Fair Isaac's message that any credit score other than a FICO Score is a "Fako" score. For example, thebalance.com—a

website devoted to personal finance issues—posted in February 2017: "If you purchased your credit score from anywhere but MyFICO.com, then it's a Fako score."

83.     Fair Isaac's campaign against VantageScore and other competitors in the Business Market for credit scores is not new. Just months after the launch of VantageScore in 2006, Fair Isaac filed a meritless lawsuit against Equifax, Experian, TransUnion, and VantageScore Solutions in the United States District Court for the District of Minnesota (No. 0:06-cv-04112). Fair Isaac's numerous claims included a claim that the development of VantageScore violated the antitrust laws, and a claim that the development of VantageScore constituted trademark infringement. In its prayer for relief, Fair Isaac sought nothing less than the end of VantageScore Solutions: it requested that the "Defendants be ordered to dissolve VantageScore . . . ." *Fair Isaac Corp. v. Equifax, Inc. et al*, No. 0:06-cv-04112, ECF No. 1-1 at 65 (D. Minn. Oct. 11, 2006). The frivolous lawsuit represented Fair Isaac's first attempt to kill VantageScore before it could catch on in the market.

84.     All of Fair Isaac's claims failed. In fact, the jury concluded that Fair Isaac was the wrongdoer. In support of its trademark infringement claim, Fair Isaac had alleged that VantageScore's use of a scoring range of 501-990 constituted trademark infringement because it was similar to FICO's scoring range of 300-850. The credit reporting agencies and VantageScore Solutions counterclaimed for fraud on the United States Patent and Trademark Office ("PTO"), alleging that Fair Isaac had misrepresented to the PTO that only FICO used the 300-850 score range. The jury concluded that Fair Isaac had committed fraud on the PTO by making false statements as part of its application to register the score range of 300-850 as a trademark.

85.     The public statements described in the foregoing paragraphs were transmitted to and seen by a substantial number of businesses and consumers nationwide.

**H.     Fair Isaac's Anticompetitive Conduct Harms Competition and Enabled Fair Isaac to Charge Supracompetitive Prices for Business Credit Scores**

86. Fair Isaac's campaign of exclusionary conduct to maintain and expand its monopoly harmed and continues to harm business-customers in the Business Market for credit scores. Fair Isaac's unlawful conduct, including conduct taken in concert with the credit bureaus, has foreclosed competition in the Business Market by eliminating fair opportunities for the credit bureaus to sell VantageScore or any other competing credit score product to business-customers.

87. Fair Isaac's conduct reduced choice for business-customers in the Business Market for credit scores. The anticompetitive terms that Fair Isaac imposed on the credit bureaus frustrated the ability of business-customers to purchase VantageScore or any other competing Business Credit Scoring Product. As a direct and proximate result of Fair Isaac's exclusionary and anticompetitive conduct, Fair Isaac has been able to indirectly charge Plaintiffs and all similarly situated businesses supracompetitive prices for credit scores. As buyers of Fair Isaac's FICO Scores, Plaintiffs and all similarly situated business have been harmed by Fair Isaac's supracompetitive royalty prices.

88. Publicly available documents reporting Fair Isaac's revenues and profits from its Business Credit Scoring Products reveal that Fair Isaac's sales in the Business Market over the past five fiscal years are immensely profitable. Fair Isaac maintains a tremendous profit margin on the revenue it earns from its Business Credit Scoring Products. Plaintiffs and similarly situated businesses vastly overpaid for FICO Scores.

## V. CLASS ACTION ALLEGATIONS

89. Plaintiffs bring this action on behalf of themselves and, pursuant to Rules 23(a) and (b) of the Federal Rules of Civil Procedure, on behalf of all end-user business-customers that indirectly purchased a FICO Score in the Business Market for credit scores for use and not for resale from January 1, 2006 through the present.

90.     The Class Period is January 1, 2006 through the present.

91.     A Repealer Jurisdiction is a state or district that has repealed the bar on indirect purchaser plaintiffs recovering under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), and includes the following: Arizona, California, District of Columbia, Florida, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

92.     The State Subclasses are collectively referred to as the "Class" unless otherwise indicated. Any and all natural persons are not members of the Class by its definition. For an abundance of clarity, the following are specifically excluded from the Class: the Defendant; the officers, directors, and employees of the Defendant; any entity in which the Defendant has a controlling interest; and any affiliate, legal representative, heir, or assign of the Defendant. Also excluded from the Class are: any federal, state, or local governmental entity; any judicial officer presiding over this action and the members of his/her immediate family and judicial staff; any juror assigned to this action; and any co-conspirator identified in this action.

93.     Members of the Class are so numerous and geographically dispersed that joinder is impracticable. Further, members of the Class are readily identifiable from information and records in the possession of Defendant.

94.     Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and members of the Class were damaged by the same wrongful conduct of Defendant.

95.     Plaintiffs will fairly and adequately protect and represent the interests of members of the Class. The interests of Plaintiffs are coincident with, and not antagonistic to, those of members of the Class.

96.     Plaintiffs are represented by counsel with experience in the prosecution and leadership of class action antitrust and other complex litigation, including antitrust class actions in the financial services industry.

97.     Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members, thereby making damages with respect to members of the Class as a whole appropriate. Questions of law and fact common to members of the Class include, but are not limited to:

> a.     whether Defendant contracted, monopolized or unreasonably restrained trade in violation of federal law;
>
> b.     whether Defendant monopolized or unreasonably restrained trade in violation of certain state antitrust laws;
>
> c.     whether Defendant engaged in unfair or deceptive trade practices in violation of certain state laws;
>
> d.     the duration of the alleged unlawful conduct;
>
> e.     injury suffered by Plaintiffs and members of the Class;
>
> f.     damages suffered by Plaintiffs and members of the Class; and
>
> g.     whether Defendant has acted or refused to act on grounds generally applicable to members of the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to members of the Class as a whole.

98.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would require.

99.     The benefit of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued

individually, substantially outweighs potential difficulties in management of this class action.

100.   The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendant.

101.   Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

102.   Defendant has acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

103.   Plaintiffs have defined members of the Class based on currently available information and hereby reserves the right to amend the definition of members of the Class, including, without limitation, the Class Period.

## VI.   STATUTES OF LIMITATION AND TOLLING

104.   Plaintiffs incorporate by reference and re-alleges the preceding allegations as though fully set forth herein.

105.   Fair Isaac, aware of its illegal scheme to maintain and extend its monopoly in the Business Market for credit scores and its injurious effects on business-customers, fraudulently concealed the scheme by failing to report it while reaping illicit profits from the inflated prices it charged.

106.   The anticompetitive agreements between Fair Isaac and the credit bureaus were not discoverable until TransUnion filed its counterclaims against Fair Isaac in February 2018. The Agreements remain secret, and Plaintiffs and the members of the Class had no way of knowing the terms of the agreements between Fair Isaac and the credit bureaus until after they were alleged in TransUnion's filings.

107. Accordingly, Plaintiffs and members of the Class had no knowledge of Defendant's unlawful self-concealing scheme and could not have discovered the scheme and conspiracy through the exercise of reasonable diligence more than four years before the filing of this complaint. This is true because the nature of Defendant's scheme was self-concealing and because Fair Isaac employed deceptive tactics and techniques of secrecy to avoid detection of, and to conceal, its anticompetitive scheme.

108. Fair Isaac wrongfully and affirmatively concealed the existence of its ongoing scheme from Plaintiffs and members of the Class by, among other things:

   a. Concealing the fact of the credit bureaus' agreement, through the "No Equivalent Products" clause, not to internally develop a competing credit scoring system that is aligned with FICO Scores or uses too many of the same reason codes;

   b. Concealing the fact that the purpose of the "No Equivalent Products" agreement is to block the credit bureaus from offering credit scoring products that would allow business-consumers a legitimate choice between FICO Scores and VantageScore or another alternative scoring product, thereby protecting and sustaining Fair Isaac's monopoly;

   c. Concealing the fact of its agreement with each of the credit bureaus, through the "Level Playing Field" and "Dynamic Royalty Schedule" clauses, to require that prices made available to one credit bureau be made available to all the others;

   d. Concealing the fact that the purpose of the "Level Playing Field" and "Dynamic Royalty Schedule" clauses is to disincentivize each credit bureau from negotiating lower royalty prices for FICO Scores; and

   e. Filing documents with the United States Securities and Exchange Commission that failed to disclose the existence or nature of these anticompetitive agreements.

109. Because the anticompetitive agreements were both self-concealing and affirmatively concealed by Fair Isaac, Plaintiffs and members of the Class had no knowledge of the anticompetitive agreements more than four years before the filing of this complaint; nor did they have the facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy

31

existed.

110. Plaintiffs and members of the Class also lacked the facts and information necessary to form a good faith basis for believing that any legal violations had occurred.

111. Reasonable diligence on the part of Plaintiffs and members of the Class would not have uncovered those facts more than four years before the filing of this complaint.

112. As a result of Defendant's affirmative acts, misrepresentations, and nondisclosures as alleged herein, any applicable statutes of limitation on claims asserted by Plaintiffs and members of the Class have been and are tolled, and Defendant is equitably estopped from raising statutes of limitations as a defense.

113. Any applicable statutes of limitations were tolled at least until February 12, 2018, the date that TransUnion filed its Counterclaim against Defendant in *Fair Isaac Corp. v. Trans Union LLC*, No. 1:17-cv-08318 (N.D. Ill.).

114. The federal government's initiation of its antitrust investigation of Defendant's unlawful conduct also operates to toll any federal statute of limitations under 15 U.S.C. § 16.

## VII. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### VIOLATION OF SECTION 1 OF THE SHERMAN ACT
### 15 U.S.C. § 1
### (ON BEHALF OF RESIDENTS IN REPEALER JURISDICTIONS FOR INJUNCTIVE AND EQUITABLE RELIEF)

115. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

116. The Business Market for credit scores in the United States constitutes the relevant market.

117. Fair Isaac has had and continues to have at least a 90% market share in the Business

Market for credit scores in the United States.

118.    Fair Isaac has had and continues to have monopoly power in the Business Market for credit scores in the United States.

119.    Fair Isaac has had and continues to have the power to control prices and/or exclude competition in the Business Market for credit scores in the United States.

120.    Fair Isaac entered into agreements with Equifax, Experian, and TransUnion that contained anticompetitive terms that were designed to hobble Fair Isaac's competitors and to keep prices for FICO Scores artificially high.

121.    The agreements between Fair Isaac and the credit bureaus had substantial anticompetitive effects. The agreements effectively excluded VantageScore Solutions and every other competing provider of credit scores from competing for a substantial portion of transactions in the relevant market.

122.    The agreements between Fair Isaac and the credit bureaus raised prices for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to business-customers.

123.    Fair Isaac's exclusionary and anticompetitive acts have injured and will continue to injure competition in this market.

124.    Fair Isaac's exclusionary and anticompetitive acts affect interstate commerce and injure competition nationwide.

125.    Fair Isaac's conduct has caused Plaintiffs and all other similarly situated businesses to suffer damages in the form of injuries to their business or property, and Plaintiffs and all other similarly situated businesses will continue to suffer such damages if Fair Isaac does not cease its anticompetitive conduct.

126.    Plaintiffs and all other similarly situated businesses have been injured in their business or property by reason of Fair Isaac's violation of Sections 1 and 2 of the Sherman Act within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C § 15.

127.    Plaintiffs and all other similarly situated businesses are threatened with future injury to their business and property by reason of Fair Isaac's continuing violation of Sections 1 and 2 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

128.    Plaintiffs and members of the Class are entitled to an injunction against Defendant, preventing and restraining the violations alleged herein.

### SECOND CLAIM FOR RELIEF
### VIOLATION OF SECTION 2 OF THE SHERMAN ACT
### 15 U.S.C. § 2
### (ON BEHALF OF RESIDENTS IN REPEALER JURISDICTIONS FOR INJUNCTIVE AND EQUITABLE RELIEF)

129.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

130.    The Business Market for credit scores in the United States constitutes the relevant market.

131.    Fair Isaac has had and continues to have at least a 90% market share in the Business Market for credit scores in the United States.

132.    Fair Isaac has had and continues to have monopoly power in the Business Market for credit scores in the United States.

133.    Fair Isaac has had and continues to have the power to control prices and/or exclude competition in the Business Market for credit scores in the United States.

134.    Fair Isaac entered into agreements with Equifax, Experian, and TransUnion that contained anticompetitive terms that were designed to hobble Fair Isaac's competitors and to keep

34

prices for FICO Scores artificially high.

135.    The agreements between Fair Isaac and the credit bureaus had substantial anticompetitive effects. The agreements effectively excluded VantageScore Solutions and every other competing provider of credit scores from competing for a substantial portion of transactions in the relevant market.

136.    The agreements between Fair Isaac and the credit bureaus raised prices for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to business-customers.

137.    Fair Isaac's exclusionary and anticompetitive acts have injured and will continue to injure competition in this market.

138.    Fair Isaac's exclusionary and anticompetitive acts affect interstate commerce and injure competition nationwide.

139.    Fair Isaac's conduct has caused Plaintiffs and all other similarly situated businesses to suffer damages in the form of injuries to their business or property, and Plaintiffs and all other similarly situated businesses will continue to suffer such damages if Fair Isaac does not cease its anticompetitive conduct.

140.    Plaintiffs and all other similarly situated businesses have been injured in their business or property by reason of Fair Isaac's violation of Sections 1 and 2 of the Sherman Act within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C § 15.

141.    Plaintiffs and all other similarly situated businesses are threatened with future injury to their business and property by reason of Fair Isaac's continuing violation of Sections 1 and 2 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

142.    Plaintiffs and members of the Class are entitled to an injunction against Defendant,

preventing and restraining the violations alleged herein.

## VIOLATIONS OF STATE ANTITRUST LAWS

143.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

144.    The following Third through Twenty-Eighth Claims for Relief are pleaded under the antitrust laws of each State or jurisdiction identified below, on behalf of the indicated subclass.

## THIRD CLAIM FOR RELIEF
### VIOLATION OF ARIZONA'S UNIFORM STATE ANTITRUST ACT, ARIZ. REV. STAT. § 44-1401, *ET SEQ.* (ON BEHALF OF THE ARIZONA SUBCLASS)

145.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

146.    By reason of the conduct alleged herein, Defendant has violated Arizona Rev. Stat. § 44-1401, *et seq.*

147.    Under Arizona law, indirect purchasers have standing to maintain an action under the Antitrust Act based on the facts alleged in this Complaint. *Bunker's Glass Co. v. Pilkington PLC*, 206 Ariz. 9, 11-20 (2003).

148.    Defendant entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Business Market for credit scores, a substantial part of which occurred within Arizona.

149.    Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Business Market for credit scores, a substantial part of which occurred within Arizona, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Business Market for credit scores.

150.    Defendant's violations of Arizona law were flagrant.

151.    Defendant's unlawful conduct substantially affected Arizona's trade and commerce.

152.    As a direct and proximate cause of Defendant's unlawful conduct, Plaintiffs and members of the Arizona Subclass have been injured in their business or property and are threatened with further injury.

153.    By reason of the foregoing, Plaintiffs and members of the Arizona Subclass are entitled to seek all forms of relief available under Arizona Revised Statute § 44-1401, *et seq.*

154.    In conjunction with the filing of this Complaint, Plaintiffs have served a copy of this Complaint on the Arizona Attorney General in accordance with Ariz. Rev. Stat. Ann. § 44-1415. Plaintiffs will file proof of such service with the Court.

**FOURTH CLAIM FOR RELIEF**
**VIOLATION OF CALIFORNIA'S CARTWRIGHT ACT,**
**CAL. BUS. & PROF. CODE § 16700, *ET SEQ.***
**(ON BEHALF OF THE CALIFORNIA SUBCLASS)**

155.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

156.    The California Business & Professions Code generally governs conduct of corporate entities. The Cartwright Act, Cal. Bus. & Prof. Code §§ 16700-16770, governs antitrust violations in California.

157.    California policy is that "vigorous representation and protection of consumer interests are essential to the fair and efficient functioning of a free enterprise market economy," including by fostering competition in the marketplace. Cal. Bus. & Prof. Code § 301.

158.    Under the Cartwright Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Cal. Bus. & Prof. Code § 16750(a).

159.    A trust in California is any combination of capital, skills or acts by two or more persons intended for various purposes, including but not limited to creating or carrying out restrictions in trade or commerce, limiting or reducing the production or increasing the price of any

37

commodity, or preventing competition in the market for a commodity. Cal. Bus. & Prof. Code § 16720. Every trust in California is unlawful except as provided by the Code. *Id.* at § 16726.

160.    Defendant entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Business Market for credit scores, a substantial part of which occurred within California.

161.    Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Business Market for credit scores, a substantial part of which occurred within California, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Business Market for credit scores.

162.    Members of the California Subclass purchased FICO Scores within the State of California during the Class Period. But for Defendant's conduct set forth herein, the price of FICO Scores would have been lower, in an amount to be determined at trial.

163.    Defendant enacted a combination of capital, skill or acts for the purpose of creating and carrying out restrictions in trade or commerce, in violation of Cal. Bus. & Prof. Code § 16700, *et seq.*

164.    Members of the California Subclass were injured in their business or property, with respect to purchases of FICO Scores in California and are entitled to all forms of relief, including recovery of treble damages, interest, and injunctive relief, plus reasonable attorneys' fees and costs.

### FIFTH CLAIM FOR RELIEF
### VIOLATION OF THE DISTRICT OF COLUMBIA ANTITRUST ACT,
### D.C. CODE § 28-4501, *ET SEQ.*
### (ON BEHALF OF THE DISTRICT OF COLUMBIA SUBCLASS)

165.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

166.    The policy of District of Columbia Code, Title 28, Chapter 45 (Restraints of Trade)

is to "promote the unhampered freedom of commerce and industry throughout the District of Columbia by prohibiting restraints of trade and monopolistic practices." D.C. Code § 28-4501.

167.     Members of the District of Columbia Subclass purchased FICO Scores within the District of Columbia during the Class Period. But for Defendant's conduct set forth herein, the price of FICO Scores would have been lower, in an amount to be determined at trial.

168.     Under District of Columbia law, indirect purchasers have standing to maintain an action under the antitrust provisions of the D.C. Code based on the facts alleged in this Complaint, because "[a]ny indirect purchaser in the chain of manufacture, production or distribution of goods or services . . . shall be deemed to be injured within the meaning of this chapter." D.C. Code § 28-4509(a).

169.     Defendant contracted, combined or conspired to act in restraint of trade within the District of Columbia, and monopolized or attempted to monopolize the Business Market for credit scores within the District of Columbia, in violation of D.C. Code § 28-4501, *et seq.*

170.     Members of the District of Columbia Subclass were injured with respect to purchases of FICO Scores in the District of Columbia and are entitled to all forms of relief, including actual damages, treble damages, interest, and reasonable attorneys' fees and costs.

**SIXTH CLAIM FOR RELIEF**
**VIOLATION OF THE ILLINOIS ANTITRUST ACT,**
**740 ILL. COMP. STAT. ANN. 10/1, *ET SEQ.***
**(ON BEHALF OF THE ILLINOIS SUBCLASS)**

171.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

172.     The Illinois Antitrust Act, 740 Ill. Comp. Stat. Ann. 10/1, *et seq.*, aims "to promote the unhampered growth of commerce and industry throughout the State by prohibiting restraints of trade which are secured through monopolistic or oligarchic practices and which act or tend to act to

decrease competition between and among persons engaged in commerce and trade. . . ." 740 Ill. Comp. Stat. Ann. 10/2.

173.    Members of the Illinois Subclass purchased FICO Scores within the State of Illinois during the Class Period.

174.    But for Defendant's conduct set forth herein, the price of FICO Scores would have been lower, in an amount to be determined at trial.

175.    Under the Illinois Antitrust Act, indirect purchasers have standing to maintain an action for damages based on the facts alleged in this Complaint. 740 Ill. Comp. Stat. Ann. 10/7(2).

176.    Defendant entered into contracts or engaged in a combination or conspiracy for the purpose of fixing, controlling or maintaining prices for FICO Scores sold within the State of Illinois.

177.    Defendant further unreasonably restrained trade or commerce and established, maintained, or attempted to acquire monopoly power over the Business Market for credit scores in Illinois for the purpose of excluding competition, in violation of 740 Ill. Comp. Stat. Ann. 10/1, *et seq.*

178.    Members of the Illinois Subclass were injured with respect to purchases of FICO Scores in Illinois and are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees and costs.

**SEVENTH CLAIM FOR RELIEF**
**VIOLATION OF THE IOWA COMPETITION LAW**
**IOWA CODE § 553.1, *ET SEQ.***
**(ON BEHALF OF THE IOWA SUBCLASS)**

179.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

180.    The Iowa Competition Law aims to "prohibit[] restraints of economic activity and monopolistic practices." Iowa Code § 553.2.

181.    Under Iowa law, indirect purchasers have standing to maintain an action under the Iowa Competition Law based on the facts alleged in this Complaint. *Comes v. Microsoft Corp.*, 646 N.W.2d 440, 449 (Iowa 2002).

182.    Members of the Iowa Subclass purchased FICO Scores within the State of Iowa during the Class Period. But for Defendant's conduct set forth herein, the price of FICO Scores would have been lower, in an amount to be determined at trial.

183.    Defendant contracted, combined or conspired to restrain or monopolize trade in the Business Market for credit scores, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for credit scores, in violation of Iowa Code § 553.1, *et seq.*

184.    Members of the Iowa Subclass were injured with respect to purchases of FICO Scores in Iowa, and are entitled to all forms of relief, including actual damages, exemplary damages for willful conduct, reasonable attorneys' fees and costs, and injunctive relief.

## EIGHTH CLAIM FOR RELIEF
## VIOLATION OF THE KANSAS RESTRAINT OF TRADE ACT
## KAN. STAT. ANN. § 50-101, *ET SEQ.*
## (ON BEHALF OF THE KANSAS SUBCLASS)

185.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

186.    The Kansas Restraint of Trade Act aims to prohibit practices which, inter alia, "tend to prevent full and free competition in the importation, transportation or sale of articles imported into this state . . . ." Kan. Stat. Ann § 50-112.

187.    Members of the Kansas Subclass purchased FICO Scores within the State of Kansas during the Class Period.

188.    But for Defendant's conduct set forth herein, the price of FICO Scores would have

been lower, in an amount to be determined at trial.

189.     Under the Kansas Restraint of Trade Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Kan. Stat. Ann § 50-161(b).

190.     Defendant combined capital, skills or acts for the purposes of creating restrictions in trade or commerce of credit scores, increasing the price of credit scores, or preventing competition in the sale of credit scores, in a manner that established the price of credit scores and precluded free and unrestricted competition among themselves in the sale of credit scores, in violation of Kan. Stat. Ann. § 50-101, *et seq.*

191.     Members of the Kansas Subclass were injured with respect to purchases of FICO Scores in Kansas and are entitled to all forms of relief, including actual damages, reasonable attorneys' fees and costs, and injunctive relief.

**NINTH CLAIM FOR RELIEF**
**VIOLATION OF THE MAINE'S ANTITRUST STATUTE**
**ME. REV. STAT. ANN. TIT. 10 § 1101, *ET SEQ.***
**(ON BEHALF OF THE MAINE SUBCLASS)**

192.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

193.     Part 3 of Title 10 of the Maine Revised Statutes generally governs regulation of trade in Maine. Chapter 201 thereof governs monopolies and profiteering, generally prohibiting contracts in restraint of trade and conspiracies to monopolize trade. Me. Rev. Stat. Ann. Tit. 10, §§ 1101-02.

194.     Members of the Maine Subclass purchased FICO Scores within the State of Maine during the Class Period.

195.     But for Defendant's conduct set forth herein, the price of FICO Scores would have been lower, in an amount to be determined at trial.

196.     Under Maine law, indirect purchasers have standing to maintain an action based on

the facts alleged in this Complaint. Me. Rev. Stat. Ann. Tit. 10, § 1104(1).

197.    Defendant contracted, combined or conspired in restraint of trade or commerce of credit scores within the intrastate commerce of Maine, and monopolized or attempted to monopolize the trade or commerce of credit scores within the intrastate commerce of Maine, in violation of Me. Rev. Stat. Ann. Tit. 10, § 1101, *et seq.*

198.    Members of the Maine Subclass were injured with respect to purchases of FICO Scores in Maine and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' and experts' fees and costs.

## TENTH CLAIM FOR RELIEF
## VIOLATION OF THE MICHIGAN ANTITRUST REFORM ACT
## MICH. COMP. LAWS § 445.771, *ET SEQ.*
## (ON BEHALF OF THE MICHIGAN SUBCLASS)

199.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

200.    The Michigan Antitrust Reform Act aims "to prohibit contracts, combinations, and conspiracies in restraint of trade or commerce; . . . to prohibit monopolies and attempts to monopolize trade or commerce; . . . [and] to provide remedies, fines, and penalties for violations of this act . . . ." Mich. Act 274 of 1984.

201.    Plaintiff Brookfield Management Company and other members of the Michigan Subclass purchased FICO scores within the State of Michigan during the Class Period.

202.    But for Defendant's conduct set forth herein, the price of FICO Scores would have been lower, in an amount to be determined at trial.

203.    Under the Michigan Antitrust Reform Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Mich. Comp. Laws. § 445.778(2).

204.    Defendant contracted, combined or conspired to restrain or monopolize trade or

43

commerce in the Business Market for credit scores, in violation of Mich. Comp. Laws § 445.772, *et seq.*

205.    Plaintiff Brookfield Management Company and other members of the Michigan Subclass were injured with respect to purchases of FICO Scores in Michigan and are entitled to all forms of relief, including actual damages, treble damages for flagrant violations, interest, costs, reasonable attorneys' fees, and injunctive or other appropriate equitable relief.

## ELEVENTH CLAIM FOR RELIEF
## VIOLATION OF THE MINNESOTA ANTITRUST LAW OF 1971,
## MINN. STAT. § 325D.49, *ET SEQ.*
## (ON BEHALF OF THE MINNESOTA SUBCLASS)

206.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

207.    The Minnesota Antitrust Law of 1971 prohibits "any contract, combination, or conspiracy, wherever created, formed, or entered into; any establishment, maintenance, or use of monopoly power; and any attempt to establish, maintain, or use monopoly power," whenever any of these affect Minnesota trade or commerce. Minn. Stat. § 325D.54.

208.    Members of the Minnesota Subclass purchased FICO Scores within the State of Minnesota during the Class Period. But for Defendant's conduct set forth herein, the price of FICO Scores would have been lower, in an amount to be determined at trial.

209.    Under the Minnesota Antitrust Act of 1971, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Minn. Stat. § 325D.57.

210.    Defendant contracted, combined or conspired in unreasonable restraint of trade or commerce in the Business Market for credit scores within the intrastate commerce of and outside of Minnesota; established, maintained, used or attempted to establish, maintain or use monopoly power over the trade or commerce in the Business Market for credit scores within the intrastate commerce

of and outside of Minnesota; and fixed prices and allocated markets for credit scores within the intrastate commerce of and outside of Minnesota, in violation of Minn. Stat. § 325D.49, *et seq.*

211. Members of the Minnesota Subclass were injured with respect to purchases of FICO Scores in Minnesota and are entitled to all forms of relief, including actual damages, treble damages, costs and disbursements, reasonable attorneys' fees, and injunctive relief necessary to prevent and restrain violations hereof.

**TWELFTH CLAIM FOR RELIEF**
**VIOLATION OF THE MISSISSIPPI ANTITRUST ACT,**
**MISS. CODE ANN. § 75-21-1, *ET SEQ.***
**(ON BEHALF OF THE MISSISSIPPI SUBCLASS)**

212. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

213. Title 75 of the Mississippi Code regulates trade, commerce and investments. Chapter 21 thereof generally prohibits trusts and combines in restraint or hindrance of trade, with the aim that "trusts and combines may be suppressed, and the benefits arising from competition in business [are] preserved" to Mississippians. Miss. Code Ann. § 75-21-39.

214. Trusts are combinations, contracts, understandings or agreements, express or implied, when inimical to the public welfare and with the effect of, inter alia, restraining trade, increasing the price or output of a commodity, or hindering competition in the production or sale of a commodity. Miss. Code Ann. § 75-21-1.

215. Defendant entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Business Market for credit scores, a substantial part of which occurred within Mississippi.

216. Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Business Market for credit scores, a substantial part of which

occurred within Mississippi, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Business Market for credit scores.

217.     Members of the Mississippi Subclass purchased FICO Scores within the State of Mississippi during the Class Period. But for Defendant's conduct set forth herein, the price of FICO Scores would have been lower, in an amount to be determined at trial.

218.     Under Mississippi law, indirect purchasers have standing to maintain an action under the antitrust provisions of the Mississippi Code based on the facts alleged in this Complaint. Miss. Code Ann. § 75-21-9.

219.     Defendant combined, contracted, understood and agreed in the Business Market for credit scores, in a manner inimical to public welfare, with the effect of restraining trade, increasing the price of FICO Scores and hindering competition in the sale of credit scores, in violation of Miss. Code Ann. § 75-21-1, *et seq.*

220.     Defendant monopolized or attempted to monopolize the production, control or sale of , in violation of Miss. Code Ann. § 75-21-3, *et seq.*

221.     Defendant's FICO Scores are sold indirectly via distributors throughout the State of Mississippi. During the Class Period, Defendant's illegal conduct substantially affected Mississippi commerce.

222.     Members of the Mississippi Subclass were injured with respect to purchases of FICO Scores in Mississippi and are entitled to all forms of relief, including actual damages and a penalty of $500 per instance of injury.

**THIRTEENTH CLAIM FOR RELIEF**
**VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT,**
**MO. ANN. STAT. § 407.010, *ET SEQ.***
**(ON BEHALF OF THE MISSOURI SUBCLASS)**

223.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every

allegation set forth in the preceding paragraphs of this Complaint.

224.    Chapter 407 of the Missouri Merchandising Practices Act (the "MMPA") generally governs unlawful business practices, including antitrust violations such as restraints of trade and monopolization.

225.    Members of the Missouri Subclass purchased FICO Scores within the State of Missouri during the Class Period.

226.    But for Defendant's conduct set forth herein, the price of FICO Scores would have been lower, in an amount to be determined at trial.

227.    Under Missouri law, indirect purchasers have standing to maintain an action under the MMPA based on the facts alleged in this Complaint. *Gibbons v. J. Nuckolls, Inc.*, 216 S.W.3d 667, 669 (Mo. 2008).

228.    Defendant contracted, combined or conspired in restraint of trade or commerce of credit scores within the intrastate commerce of Missouri, and monopolized or attempted to monopolize the Business Market for credit scores within the intrastate commerce of Missouri by possessing monopoly power in the market and willfully maintaining that power through agreements to fix prices, allocate markets and otherwise control trade, in violation of Mo. Ann. Stat. § 407.010, *et seq.*

229.    Members of the Missouri Subclass were injured with respect to purchases of FICO Scores in Missouri and are entitled to all forms of relief, including actual damages or liquidated damages in an amount which bears a reasonable relation to the actual damages which have been sustained, as well as reasonable attorneys' fees, costs, and injunctive relief.

## FOURTEENTH CLAIM FOR RELIEF
## VIOLATION OF THE NEBRASKA JUNKIN ACT,
## NEB. REV. STAT. § 59-801, *ET SEQ.*
## (ON BEHALF OF THE NEBRASKA SUBCLASS)

230.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

231.    Chapter 59 of the Nebraska Revised Statutes generally governs business and trade practices. Sections 801 through 831 thereof, known as the Junkin Act, prohibit antitrust violations such as restraints of trade and monopolization.

232.    Members of the Nebraska Subclass purchased FICO Scores within the State of Nebraska during the Class Period. But for Defendant's conduct set forth herein, the price of FICO Scores would have been lower, in an amount to be determined at trial.

233.    Under Nebraska law, indirect purchasers have standing to maintain an action under the Junkin Act based on the facts alleged in this Complaint. Neb. Rev. Stat. § 59-821.

234.    Defendant contracted, combined or conspired in restraint of trade or commerce of credit scores within the intrastate commerce of Nebraska, and monopolized or attempted to monopolize the Business Market for credit scores within the intrastate commerce of Nebraska by possessing monopoly power in the market and willfully maintaining that power through agreements to fix prices, allocate markets and otherwise control trade, in violation of Neb. Rev. Stat. § 59-801, *et seq.*

235.    Members of the Nebraska Subclass were injured with respect to purchases of FICO Scores in Nebraska and are entitled to all forms of relief, including actual damages or liquidated damages in an amount which bears a reasonable relation to the actual damages which have been sustained, as well as reasonable attorneys' fees, costs, and injunctive relief.

**FIFTEENTH CLAIM FOR RELIEF**
**VIOLATION OF THE NEVADA UNFAIR TRADE PRACTICES ACT,**
**NEV. REV. STAT. § 598A.010, *ET SEQ.***
**(ON BEHALF OF THE NEVADA SUBCLASS)**

236.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

237.    The Nevada Unfair Trade Practice Act ("NUTPA") states that "free, open and competitive production and sale of commodities and services is necessary to the economic well-being of the citizens of the State of Nevada." Nev. Rev. Stat. Ann. § 598A.030(1).

238.    The policy of NUTPA is to prohibit acts in restraint of trade or commerce, to preserve and protect the free, open and competitive market, and to penalize all persons engaged in anticompetitive practices. Nev. Rev. Stat. Ann. § 598A.030(2). Such acts include, inter alia, price fixing, division of markets, allocation of customers, and monopolization of trade. Nev. Rev. Stat. Ann. § 598A.060.

239.    Members of the Nevada Subclass purchased FICO Scores within the State of Nevada during the Class Period. But for Defendant's conduct set forth herein, the price of FICO Scores would have been lower, in an amount to be determined at trial.

240.    Under Nevada law, indirect purchasers have standing to maintain an action under NUTPA based on the facts alleged in this Complaint. Nev. Rev. Stat. Ann. §598A.210(2).

241.    Defendant fixed prices by agreeing to establish prices for credit scores in Nevada, divided Nevada markets, allocated Nevada customers, and monopolized or attempted monopolize trade or commerce of credit scores within the intrastate commerce of Nevada, constituting a contract, combination or conspiracy in restraint of trade in violation of Nev. Rev. Stat. Ann. § 598A.010, *et seq.*

242.    Members of the Nevada Subclass were injured with respect to purchases of FICO

Scores in Nevada in that at least thousands of sales of Defendant's FICO Scores took place in Nevada, purchased by Nevada business-customers at supra-competitive prices caused by Defendant's conduct.

243.     Accordingly, Members of the Nevada Subclass are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.

244.     In accordance with the requirements of § 598A.210(3), notice of this action was mailed to the Nevada Attorney General by Plaintiffs.

**SIXTEENTH CLAIM FOR RELIEF**
**VIOLATION OF NEW HAMPSHIRE'S ANTITRUST STATUTE,**
**N.H. REV. STAT. ANN. TIT. XXXI, § 356, *ET SEQ.***
**(ON BEHALF OF THE NEW HAMPSHIRE SUBCLASS)**

245.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

246.     Title XXXI of the New Hampshire Statutes generally governs trade and commerce. Chapter 356 thereof governs combinations and monopolies and prohibits restraints of trade. N.H. Rev. Stat. Ann. §§ 356:2, 3.

247.     Members of the New Hampshire Subclass purchased FICO Scores within the State of New Hampshire during the Class Period. But for Defendant's conduct set forth herein, the price of FICO Scores would have been lower, in an amount to be determined at trial.

248.     Under New Hampshire law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.H. Rev. Stat. Ann. § 356:11(II).

249.     Defendant fixed, controlled or maintained prices for credit scores, allocated customers or markets for credit scores, and established, maintained or used monopoly power, or attempted to, constituting a contract, combination or conspiracy in restraint of trade in violation of N.H. Rev. Stat. Ann. § 356:1, *et seq.*

250.     Members of the New Hampshire Subclass were injured with respect to purchases of FICO Scores in New Hampshire and are entitled to all forms of relief, including actual damages sustained, treble damages for willful or flagrant violations, reasonable attorneys' fees, costs, and injunctive relief.

**SEVENTEENTH CLAIM FOR RELIEF**
**VIOLATION OF THE NEW MEXICO ANTITRUST ACT,**
**N.M. STAT. ANN. §§ 57-1-1, *ET SEQ.***
**(ON BEHALF OF THE NEW MEXICO SUBCLASS)**

251.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

252.     The New Mexico Antitrust Act aims to prohibit restraints of trade and monopolistic practices. N.M. Stat. Ann. 57-1-15.

253.     Members of the New Mexico Subclass purchased FICO Scores within the State of New Mexico during the Class Period. But for Defendant's conduct set forth herein, the price of FICO Scores would have been lower, in an amount to be determined at trial.

254.     Under New Mexico law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.M. Stat. Ann. § 57-1-3(A).

255.     Defendant contracted, agreed, combined or conspired, and monopolized or attempted to monopolize trade for credit scores within the intrastate commerce of New Mexico, in violation of N.M. Stat. Ann. § 57-1-1, *et seq.*

256.     Members of the New Mexico Subclass were injured with respect to purchases of FICO Scores in New Mexico and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.

51

**EIGHTEENTH CLAIM FOR RELIEF**
**VIOLATION OF SECTION 340**
**OF THE NEW YORK GENERAL BUSINESS LAW**
**(ON BEHALF OF THE NEW YORK SUBCLASS)**

257.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

258.     Article 22 of the New York General Business Law general prohibits monopolies and contracts or agreements in restraint of trade, with the policy of encouraging competition or the free exercise of any activity in the conduct of any business, trade or commerce in New York. N.Y. Gen. Bus. Law § 340(1).

259.     Members of the New York Subclass purchased FICO Scores within the State of New York during the Class Period. But for Defendant's conduct set forth herein, the price of FICO Scores would have been lower, in an amount to be determined at trial.

260.     Under New York law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.Y. Gen. Bus. Law § 340(6).

261.     Defendant established or maintained a monopoly within the intrastate commerce of New York for the trade or commerce of credit scores and restrained competition in the free exercise of the conduct of the business of credit scores within the intrastate commerce of New York, in violation of N.Y. Gen. Bus. Law § 340, *et seq.*

262.     Members of the New York Subclass were injured with respect to purchases of FICO Scores in New York and are entitled to all forms of relief, including actual damages, treble damages, costs not exceeding $10,000, and reasonable attorneys' fees.

## NINETEENTH CLAIM FOR RELIEF
## VIOLATION OF THE NORTH CAROLINA GENERAL STATUTES,
## N.C. GEN. STAT. § 75-1, *ET SEQ.*
## (ON BEHALF OF THE NORTH CAROLINA SUBCLASS)

263. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

264. Chapter 75 of the North Carolina Statutes generally governs unlawful business practices, including antitrust violations such as restraints of trade and monopolization.

265. Under North Carolina law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *Hyde v. Abbott Labs., Inc.*, 123 N.C. App. 572, 584 (1996).

266. Defendant entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Business Market for credit scores, a substantial part of which occurred within North Carolina.

267. Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Business Market for credit scores, a substantial part of which occurred within North Carolina, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Business Market for credits scores.

268. Defendant's unlawful conduct substantially affected North Carolina's trade and commerce.

269. As a direct and proximate cause of Defendant's unlawful conduct, Plaintiffs and the members of the North Carolina Subclass have been injured in their business or property and are threatened with further injury.

270. By reason of the foregoing, Plaintiffs and members of the North Carolina Subclass are entitled to seek all forms of relief available, including treble damages, under N.C. Gen. Stat. § 75-

1, *et seq.*

## TWENTIETH CLAIM FOR RELIEF
## VIOLATION OF THE NORTH DAKOTA UNIFORM STATE ANTITRUST ACT, N.D. CENT. CODE ANN. § 51-08.1-01, *ET SEQ.* (ON BEHALF OF THE NORTH DAKOTA SUBCLASS)

271.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

272.     By reason of the conduct alleged herein, Defendant has violated North Dakota Cent. Code § 51-08.1-01, *et seq.*

273.     Members of the North Dakota Subclass purchased FICO Scores within the State of North Dakota during the Class Period. But for Defendant's conduct set forth herein, the price of FICO Scores would have been lower, in an amount to be determined at trial.

274.     Under North Dakota law, indirect purchasers have standing to maintain an action under the Antitrust Act based on the facts alleged in this Complaint. *See*, *e.g.*, *Howe v. Microsoft Corp.*, 656 N.W.2d 285, 298 (N.D. 2003).

275.     Defendant entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Business Market for credit scores, a substantial part of which occurred within North Dakota.

276.     Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Business Market for credit scores, a substantial part of which occurred within North Dakota, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Business Market for credits scores.

277.     Defendant's violations of North Dakota law were flagrant.

278.     Defendant's unlawful conduct substantially affected North Dakota's trade and commerce.

279. As a direct and proximate cause of Defendant's unlawful conduct, Plaintiffs and members of the North Dakota Subclass have been injured in their business or property and are threatened with further injury.

280. By reason of the foregoing, members of the North Dakota Subclass are entitled to seek all forms of relief available under North Dakota Cent. Code § 51-08.1-01, *et seq.*

**TWENTY-FIRST CLAIM FOR RELIEF**
**VIOLATION OF THE OREGON ANTITRUST LAW,**
**OR. REV. STAT. § 646.705, *ET SEQ.***
**(ON BEHALF OF THE OREGON SUBCLASS)**

281. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

282. Chapter 646 of the Oregon Revised Statutes generally governs business and trade practices within Oregon. Sections 705 through 880 thereof govern antitrust violations, with the policy to "encourage free and open competition in the interest of the general welfare and economy of the state." Or. Rev. Stat. § 646.715(1).

283. Members of the Oregon Subclass purchased FICO Scores within the State of Oregon during the Class Period. But for Defendant's conduct set forth herein, the price of FICO Scores would have been lower, in an amount to be determined at trial.

284. Under Oregon law, indirect purchasers have standing under the antitrust provisions of the Oregon Revised Statutes to maintain an action based on the facts alleged in this Complaint. Or. Rev. Stat. § 646.780(1)(a).

285. Defendant contracted, combined, or conspired in restraint of trade or commerce of credit scores, and monopolized or attempted to monopolize the trade or commerce of credit scores, in violation of Or. Rev. Stat. § 646.705, *et seq.*

286. Members of the Oregon Subclass were injured with respect to purchases of FICO

55

Scores within the intrastate commerce of Oregon, or alternatively to interstate commerce involving actual or threatened injury to persons located in Oregon, and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, expert witness fees and investigative costs, and injunctive relief.

**TWENTY-SECOND CLAIM FOR RELIEF**
**VIOLATION OF THE RHODE ISLAND ANTITRUST ACT,**
**R.I. GEN LAWS § 6-36-1, *ET SEQ.***
**(ON BEHALF OF THE RHODE ISLAND SUBCLASS)**

287. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

288. The Rhode Island Antitrust Act aims to promote the unhampered growth of commerce and industry throughout Rhode Island by prohibiting unreasonable restraints of trade and monopolistic practices that hamper, prevent or decrease competition. R.I. Gen. Laws § 636-2(a)(2).

289. Plaintiff Alternative Finance, Inc. and other members of the Rhode Island Subclass purchased FICO Scores within the State of Rhode Island during the Class Period. But for Defendant's conduct set forth herein, the price of FICO Scores would have been lower, in an amount to be determined at trial.

290. Under the Rhode Island Antitrust Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. R.I. Gen. Laws § 6-36-11(a).

291. Defendant contracted, combined and conspired in restraint of trade of credit scores within the intrastate commerce of Rhode Island, and established, maintained or used, or attempted to establish, maintain or use, a monopoly in the trade of credit scores for the purpose of excluding competition or controlling, fixing or maintaining prices within the intrastate commerce of Rhode Island, in violation of R.I. Gen. Laws § 6-36-1, *et seq.*

292. Plaintiff Alternative Finance and other members of the Rhode Island Subclass were

injured with respect to purchases of FICO Scores in Rhode Island and are entitled to all forms of relief, including actual damages, treble damages, reasonable costs, reasonable attorneys' fees, and injunctive relief.

**TWENTY-THIRD CLAIM FOR RELIEF**
**VIOLATION OF THE SOUTH DAKOTA ANTITRUST STATUTE,**
**S.D. CODIFIED LAWS § 37-1-3.1, *ET SEQ.***
**(ON BEHALF OF THE SOUTH DAKOTA SUBCLASS)**

293.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

294.    Chapter 37-1 of the South Dakota Codified Laws prohibits restraint of trade, monopolies and discriminatory trade practices. S.D. Codified Laws §§ 37-1-3.1, 3.2.

295.    Members of the South Dakota Subclass purchased FICO Scores within the State of South Dakota during the Class Period. But for Defendant's conduct set forth herein, the price of FICO Scores would have been lower, in an amount to be determined at trial.

296.    Under South Dakota law, indirect purchasers have standing under the antitrust provisions of the South Dakota Codified Laws to maintain an action based on the facts alleged in this Complaint. S.D. Codified Laws § 37-1-33.

297.    Defendant contracted, combined or conspired in restraint of trade or commerce of credit scores within the intrastate commerce of South Dakota, and monopolized or attempted to monopolize trade or commerce of credit scores within the intrastate commerce of South Dakota, in violation of S.D. Codified Laws § 37-1-3.1, *et seq.*

298.    Members of the South Dakota Subclass were injured with respect to purchases of FICO Scores in South Dakota and are entitled to all forms of relief, including actual damages, treble damages, taxable costs, reasonable attorneys' fees, and injunctive or other equitable relief.

**TWENTY-FOURTH CLAIM FOR RELIEF**
**VIOLATION OF THE TENNESSEE TRADE PRACTICES ACT,**
**TENN. CODE, § 47-25-101, *ET SEQ.***
**(ON BEHALF OF THE TENNESSEE SUBCLASS)**

299.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

300.     The Tennessee Trade Practices Act generally governs commerce and trade in Tennessee, and it prohibits, inter alia, all arrangements, contracts, agreements, or combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition in goods in Tennessee. All such arrangements, contracts, agreements, or combinations between persons or corporations designed, or which tend, to increase the prices of any such goods, are against public policy, unlawful, and void. Tenn. Code, § 47-25-101.

301.     Under Tennessee law, indirect purchasers have standing under the Tennessee Trade Practice Acts to maintain an action based on the facts alleged in this Complaint. *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 520 (Tenn. 2005).

302.     Defendant competed unfairly and colluded by meeting to fix prices, divide markets, and otherwise restrain trade as set forth herein, in violation of Tenn. Code, § 47-25-101, *et seq.*

303.     Defendant's conduct violated the Tennessee Trade Practice Act because it was an arrangement, contract, agreement, or combination to lessen full and free competition in goods in Tennessee, and because it tended to increase the prices of goods in Tennessee. Specifically, Defendant's combination or conspiracy had the following effects: (1) price competition for credit scores was restrained, suppressed, and eliminated throughout Tennessee; (2) prices for FICO Scores were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) members of the Tennessee Subclass were deprived of free and open competition; and (4) members of the Tennessee Subclass paid supra-competitive, artificially inflated prices for FICO Scores.

304. During the Class Period, Defendant's illegal conduct had a substantial effect on Tennessee commerce as FICO Scores were sold in Tennessee.

305. Members of the Tennessee Subclass purchased FICO Scores within the State of Tennessee during the Class Period. But for Defendant's conduct set forth herein, the price of FICO Scores would have been lower, in an amount to be determined at trial.

306. As a direct and proximate result of Defendant's unlawful conduct, Plaintiffs and the Tennessee Subclass have been injured in their business and property and are threatened with further injury.

307. Members of the Tennessee Subclass were injured with respect to purchases of FICO Scores in Tennessee and are entitled to all forms of relief available under the law, including return of the unlawful overcharges that they paid on their purchases, damages, equitable relief, and reasonable attorneys' fees.

**TWENTY-FIFTH CLAIM FOR RELIEF**
**VIOLATION OF THE UTAH ANTITRUST ACT,**
**UTAH CODE ANN. § 76-10-3101, *ET SEQ.***
**(ON BEHALF OF THE UTAH SUBCLASS)**

308. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

309. The Utah Antitrust Act aims to "encourage free and open competition in the interest of the general welfare and economy of this state by prohibiting monopolistic and unfair trade practices, combinations and conspiracies in restraint of trade or commerce . . . ." Utah Code Ann. § 76-10-3102.

310. Members of the Utah Subclass purchased FICO Scores within the State of Utah during the Class Period. But for Defendant's conduct set forth herein, the price of FICO Scores would have been lower, in an amount to be determined at trial.

311.    Under the Utah Antitrust Act, indirect purchasers who are either Utah residents or Utah citizens have standing to maintain an action based on the facts alleged in this Complaint. Utah Code Ann. § 76-10-3109(1)(a).

312.    Defendant contracted, combined or conspired in restraint of trade or commerce of credit scores, and monopolized or attempted to monopolize trade or commerce of credits scores, in violation of Utah Code Ann. § 76-10-3101, *et seq.*

313.    Members of the Utah Subclass were injured with respect to purchases of FICO Scores in Utah and are entitled to all forms of relief, including actual damages, treble damages, costs of suit, reasonable attorneys' fees, and injunctive relief.

## TWENTY-SIXTH CLAIM FOR RELIEF
## VIOLATION OF THE VERMONT CONSUMER FRAUD ACT,
## 9 VT. STAT. ANN. TIT. § 2451, *ET SEQ.*
## (ON BEHALF OF THE VERMONT SUBCLASS)

314.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

315.    By reason of the conduct alleged herein, Defendant has violated Vt. Stat. Ann. tit. 9, § 2451, *et seq.*

316.    Members of the Vermont Subclass purchased FICO Scores within the State of Vermont during the Class Period. But for Defendant's conduct set forth herein, the price of FICO Scores would have been lower, in an amount to be determined at trial.

317.    Under Vermont law, indirect purchasers have standing to maintain an action under Vermont's antitrust laws based on the facts alleged in this Complaint. *Elkins v. Microsoft Corp.*, 174 Vt. 328, 341 (2002).

318.    Defendant entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Business Market for credit scores,

a substantial part of which occurred within Vermont.

319.    Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Business Market for credit scores, a substantial part of which occurred within Vermont, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Business Market for credits scores.

320.    Defendant's violations of Vermont law were flagrant.

321.    Defendant's unlawful conduct substantially affected Vermont's trade and commerce.

322.    As a direct and proximate cause of Defendant's unlawful conduct, Plaintiffs and members of the Vermont Subclass have been injured in their business or property and are threatened with further injury.

323.    By reason of the foregoing, members of Vermont Subclass are entitled to seek all forms of relief available under Vt. Stat. Ann. tit. 9, § 2451, *et seq.*

**TWENTY-SEVENTH CLAIM FOR RELIEF**
**VIOLATION OF THE WEST VIRGINIA ANTITRUST ACT,**
**W. VA. CODE § 47-18-1,** *ET SEQ.*
**(ON BEHALF OF THE WEST VIRGINIA SUBCLASS)**

324.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

325.    The violations of law set forth above also constitute violations of Chapter 47, Article 18 of the West Virginia Code.

326.    During the Class Period, Defendant engaged in a continuing contract, combination or conspiracy in unreasonable restraint of trade and commerce within the intrastate commerce of West Virginia and other anticompetitive conduct alleged above in violation of W. Va. Code § 47-18-1, *et seq.*

327. Defendant entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Business Market for credit scores, a substantial part of which occurred within West Virginia.

328. Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Business Market for credit scores, a substantial part of which occurred within West Virginia, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Business Market for credit scores.

329. Members of the West Virginia Subclass purchased FICO Scores within the State of West Virginia during the Class Period. But for Defendant's conduct set forth herein, the price of FICO Scores would have been lower, in an amount to be determined at trial.

330. Under West Virginia law, indirect purchasers have standing to maintain an action under the West Virginia Antitrust Act based on the facts alleged in this Complaint. W. Va. Code R. 142-9-2.

331. Defendant's anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the West Virginia Antitrust Act.

332. As a direct and proximate result of Defendant's unlawful conduct, Plaintiffs and members of the West Virginia Subclass have been injured in their business and property in that they paid more for FICO Scores than they otherwise would have paid in the absence of Defendant's unlawful conduct.

333. As a result of Defendant's violation of Section 47-18-3 of the West Virginia Antitrust Act, Members of the West Virginia Subclass seek treble damages and their cost of suit, including reasonable attorneys' fees, pursuant to section 47-18-9 of the West Virginia Code.

**TWENTY-EIGHTH CLAIM FOR RELIEF**
**VIOLATION OF THE WISCONSIN ANTITRUST ACT,**
**WIS. STAT. § 133.01,** *ET SEQ.*
**(ON BEHALF OF THE WISCONSIN SUBCLASS)**

334.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

335.     Chapter 133 of the Wisconsin Statutes governs trust and monopolies, with the intent "to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition by prohibiting unfair and discriminatory business practices which destroy or hamper competition." Wis. Stat. § 133.01.

336.     Members of the Wisconsin Subclass purchased FICO Scores within the State of Wisconsin during the Class Period. But for Defendant's conduct set forth herein, the price of FICO Scores would have been lower, in an amount to be determined at trial.

337.     Under Wisconsin law, indirect purchasers have standing under the antitrust provisions of the Wisconsin Statutes to maintain an action based on the facts alleged in this Complaint. Wis. Stat. 133.18(1)(a).

338.     Defendant contracted, combined or conspired in restraint of trade or commerce of credit scores, and monopolized or attempted to monopolize the trade or commerce of credit scores, with the intention of injuring or destroying competition therein, in violation of Wis. Stat. § 133.01, *et seq.*

339.     Members of the Wisconsin Subclass were injured with respect to purchases of FICO Scores in Wisconsin in that the actions alleged herein substantially affected the people of Wisconsin, with at least thousands of consumers in Wisconsin paying substantially higher prices for Defendant's FICO Scores in Wisconsin.

340.     Accordingly, Plaintiffs and members of the Wisconsin Subclass are entitled to all

forms of relief, including actual damages, treble damages, costs and reasonable attorneys' fees, and injunctive relief.

341.    Defendant's anticompetitive activities have directly, foreseeably and proximately caused injury to Plaintiffs and members of the Class. Their injuries consist of: (1) being denied the opportunity to purchase lower-priced credit scores from Defendant and/or other sellers of credit scores, and (2) paying higher prices for FICO Scores than they would have in the absence of Defendant's conduct. These injuries are of the type of the laws of the above States were designed to prevent, and flow from that which makes Defendant's conduct unlawful.

## VIOLATIONS OF STATE CONSUMER PROTECTION LAWS

342.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

343.    The following Twenty-Ninth through Thirty-Ninth Claims for Relief are pleaded under the consumer protection or similar laws of each State or jurisdiction identified below, on behalf of the indicated subclass.

## TWENTY-NINTH CLAIM FOR RELIEF
## VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW
## CAL. BUS. & PROF. CODE § 17200, *ET SEQ.* (THE "UCL")
## (ON BEHALF OF THE CALIFORNIA SUBCLASS)

344.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

345.    The violations of federal antitrust law set forth above also constitute violations of section 17200, *et seq.* of California Business and Professions Code.

346.    Defendant has engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the UCL by engaging in the acts and practices specified above. This claim is instituted pursuant to sections 17203 and 17204 of California Business and Professions Code, to obtain restitution from this Defendant for acts, as alleged herein, that violated

the UCL.

347. Defendant's conduct as alleged herein violated the UCL. The acts, omissions, misrepresentations, practices and non-disclosures of Defendant, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of the UCL, including, but not limited to, the violations of section 16720, *et seq.*, of California Business and Professions Code, set forth above.

348. Defendant's acts, omissions, misrepresentations, practices, and non- disclosures, as described above, whether or not in violation of section 16720, *et seq.*, of California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent.

349. Plaintiffs and members of the California Subclass are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendant as a result of such business acts or practices.

350. The illegal conduct alleged herein is continuing and there is no indication that Defendant will not continue such activity into the future.

351. The unlawful and unfair business practices of Defendant, and each of them, as described above, have caused and continue to cause Plaintiffs and the members of the California Subclass to pay supra-competitive and artificially-inflated prices for FICO Scores sold in the State of California. Plaintiffs and the members of the California Subclass suffered injury in fact and lost money or property as a result of such unfair competition.

352. As alleged in this Complaint, Defendant and its co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendant's unfair competition.

65

Plaintiffs and the members of the California Subclass are accordingly entitled to equitable relief.

**THIRTIETH CLAIM FOR RELIEF**
**VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT,**
**FLA. STAT. § 501.201, *ET SEQ.***
**(ON BEHALF OF THE FLORIDA SUBCLASS)**

353.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

354.    The Florida Deceptive & Unfair Trade Practices Act, Florida Stat. § 501.201, *et seq.* (the "FDUTPA"), generally prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce," including practices in restraint of trade. Florida Stat. § 501.204(1).

355.    The primary policy of the FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2).

356.    A claim for damages under the FDUTPA has three elements: (1) a prohibited practice; (2) causation; and (3) actual damages.

357.    Under Florida law, indirect purchasers have standing to maintain an action under the FDUTPA based on the facts alleged in this Complaint. Fla. Stat. § 501.211(a) ("anyone aggrieved by a violation of this [statute] may bring an action . . .").

358.    Members of the Florida Subclass purchased FICO Scores within the State of Florida during the Class Period. But for Defendant's conduct set forth herein, the price of FICO Scores would have been lower, in an amount to be determined at trial.

359.    Defendant entered into a contract, combination or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Business Market for

66

credit scores, a substantial part of which occurred within Florida.

360.     Defendant established, maintained or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Business Market for credit scores, for the purpose of excluding competition or controlling, fixing or maintaining prices in Florida at a level higher than the competitive market level, beginning at least as early as 2006 and continuing through the date of this filing.

361.     Accordingly, Defendant's conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the State of Florida.

362.     Defendant's unlawful conduct substantially affected Florida's trade and commerce.

363.     As a direct and proximate cause of Defendant's unlawful conduct, Plaintiffs and the members of the Florida Subclass have been injured in their business or property by virtue of overcharges for FICO Scores and are threatened with further injury.

364.     By reason of the foregoing, the members of the Florida Subclass are entitled to seek all forms of relief, including injunctive relief pursuant to Florida Stat. § 501.208 and declaratory judgment, actual damages, reasonable attorneys' fees and costs pursuant to Florida Stat. § 501.211.

**THIRTY-FIRST CLAIM FOR RELIEF**
**VIOLATION OF THE NEBRASKA CONSUMER PROTECTION ACT,**
**NEB. REV. STAT. § 59-1602, *ET SEQ.***
**(ON BEHALF OF THE NEBRASKA SUBCLASS)**

365.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

366.     By reason of the conduct alleged herein, Defendant has violated Neb. Rev. Stat. § 59-1602, *et seq.*

367.     Under Nebraska law, indirect purchasers have standing to maintain an action under the Nebraska Consumer Protection Act based on the facts alleged in this Complaint. Neb. Rev. Stat. § 59-1609.

368.     Defendant has entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Business Market for credit scores, a substantial part of which occurred within Nebraska.

369.     Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Business Market for credit scores, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within Nebraska.

370.     Defendant's conduct was conducted with the intent to deceive Nebraska consumers regarding the nature of Defendant's actions within the stream of Nebraska commerce.

371.     Defendant's conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nebraska.

372.     Defendant's conduct misled consumers, withheld material facts, and had a direct or indirect impact upon Plaintiffs and members-of-the-Class's ability to protect themselves.

373.     Defendant's unlawful conduct substantially affected Nebraska's trade and commerce.

374.     As a direct and proximate cause of Defendant's unlawful conduct, Plaintiffs and the members of the Nebraska Subclass have been injured in their business or property and are threatened with further injury.

375.    By reason of the foregoing, the members of the Nebraska Subclass are entitled to seek all forms of relief available under Neb. Rev. Stat. § 59-1602, *et seq.*

## THIRTY-SECOND CLAIM FOR RELIEF
## VIOLATION OF THE NEW HAMPSHIRE CONSUMER PROTECTION ACT,
## N.H. REV. STAT. T. XXXI, § 358-A, *ET SEQ.*
## (ON BEHALF OF THE NEW HAMPSHIRE SUBCLASS)

376.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

377.    By reason of the conduct alleged herein, Defendant has violated N.H. Rev. Stat. T. XXXI, § 358-A, *et seq.*

378.    Under New Hampshire law, indirect purchasers have standing to maintain an action under the New Hampshire Consumer Protection Act based on the facts alleged in this Complaint. *LaChance v. U.S. Smokeless Tobacco Co.*, 156 N.H. 88, 92-100 (2007)

379.    Defendant has entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Business Market for credit scores, a substantial part of which occurred within New Hampshire.

380.    Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Business market for credit scores, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within New Hampshire.

381.    Defendant's conduct was conducted with the intent to deceive New Hampshire consumers regarding the nature of Defendant's actions within the stream of New Hampshire commerce.

382.    Defendant's conduct was unfair or deceptive within the conduct of commerce within the State of New Hampshire.

69

383.     Defendant's conduct was willful and knowing.

384.     Defendant's conduct misled consumers, withheld material facts, and had a direct or indirect impact upon Plaintiffs and members-of-the-Class's ability to protect themselves.

385.     Defendant's unlawful conduct substantially affected New Hampshire's trade and commerce.

386.     As a direct and proximate cause of Defendant's unlawful conduct, Plaintiffs and the members of the New Hampshire Subclass have been injured in their business or property and are threatened with further injury.

387.     By reason of the foregoing, the members of the New Hampshire Subclass are entitled to seek all forms of relief available under N.H. Rev. Stat. T. XXXI, §§ 358-A:10 and 358-A:10-a.

## THIRTY-THIRD CLAIM FOR RELIEF
## VIOLATION OF THE NEW MEXICO UNFAIR PRACTICES ACT, N.M. STAT. ANN. §§ 57-12-1, *ET SEQ.* (ON BEHALF OF THE NEW MEXICO SUBCLASS)

388.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

389.     By reason of the conduct alleged herein, Defendant has violated N.M. Stat. Ann. §§ 57-12-3, *et seq.*

390.     Defendant entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Business Market for credit scores, a substantial part of which occurred within New Mexico.

391.     Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Business Market for credit scores, a

70

substantial part of which occurred within New Mexico, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Business Market for credit scores.

392.    Defendant's conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of New Mexico.

393.    Defendant's conduct misled consumers, withheld material facts, and resulted in material misrepresentations to Plaintiffs and members of the New Mexico Subclass.

394.    Defendant's unlawful conduct substantially affected New Mexico's trade and commerce.

395.    Defendant's conduct constituted "unconscionable trade practices" in that such conduct, inter alia, resulted in a gross disparity between the value received by the members of the New Mexico Subclass and the price paid by them for FICO Scores as set forth in N.M. Stat. Ann. § 57-12-2E.

396.    Defendant's conduct was willful.

397.    As a direct and proximate cause of Defendant's unlawful conduct, Plaintiffs and the members of the New Mexico Subclass have been injured in their business or property and are threatened with further injury.

398.    By reason of the foregoing, members of the New Mexico Subclass are entitled to seek all forms of relief, including actual damages or up to $300 per violation, whichever is greater, plus reasonable attorney's fees under N.M. Stat. Ann. §§ 57-12-10.

**THIRTY-FOURTH CLAIM FOR RELIEF**
**VIOLATION OF THE NORTH CAROLINA UNFAIR TRADE AND BUSINESS**
**PRACTICES ACT,**
**N.C. GEN. STAT. § 75-1, *ET SEQ.***
**(ON BEHALF OF THE NORTH CAROLINA SUBCLASS)**

399.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

400.     By reason of the conduct alleged herein, Defendant has violated N.C. Gen. Stat. § 75-1, *et seq.*

401.     Under North Carolina law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *Hyde v. Abbott Labs., Inc.*, 123 N.C. App. 572, 584 (1996).

402.     Defendant entered into a contract, combination, or conspiracy in restraint of, or to monopolize, trade or commerce in the Business Market for credit scores, a substantial part of which occurred within North Carolina.

403.     Defendant's conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of North Carolina.

404.     Defendant's trade practices are and have been immoral, unethical, unscrupulous, and substantially injurious to consumers.

405.     Defendant's conduct misled consumers, withheld material facts, and resulted in material misrepresentations to Plaintiffs and members of the North Carolina Subclass.

406.     Defendant's unlawful conduct substantially affected North Carolina's trade and commerce.

407.     Defendant's conduct constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse

impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

408.    As a direct and proximate cause of Defendant's unlawful conduct, Plaintiffs and the members of the North Carolina Subclass have been injured in their business or property and are threatened with further injury.

409.    By reason of the foregoing, Plaintiffs and the members of the North Carolina Subclass are entitled to seek all forms of relief, including treble damages under N.C. Gen. Stat. § 75-16.

## THIRTY-FIFTH CLAIM FOR RELIEF
## VIOLATION OF THE OREGON UNLAWFUL TRADE PRACTICES ACT,
## OR. REV. STAT. § 646.605, *ET SEQ.*
## (ON BEHALF OF THE OREGON SUBCLASS)

410.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

411.    By reason of the conduct alleged herein, Defendant has violated Or. Rev. Stat. § 646.608, *et seq.*

412.    Defendant has entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Business Market for credit scores, a substantial part of which occurred within Oregon.

413.    Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Business Market for Credit Scores, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within Oregon.

414.    Defendant's conduct was conducted with the intent to deceive Oregon consumers regarding the nature of Defendant's actions within the stream of Oregon commerce.

415. Defendant's conduct was unfair or deceptive within the conduct of commerce within the State of Oregon.

416. Defendant's conduct misled consumers, withheld material facts, and had a direct or indirect impact upon Plaintiffs' and members-of-the-Class's ability to protect themselves.

417. Defendant's unlawful conduct substantially affected Oregon's trade and commerce.

418. As a direct and proximate cause of Defendant's unlawful conduct, Plaintiffs and the members of the Oregon Subclass have been injured in their business or property and are threatened with further injury.

419. By reason of the foregoing, Plaintiffs and the members of the Oregon Subclass are entitled to seek all forms of relief available under Or. Rev. Stat. § 646.638.

420. Pursuant to section 646.638 of the Oregon Unlawful Trade Practices Act, with the filing of this action, a copy of this Complaint is being served upon the Attorney General of Oregon.

### THIRTY-SIXTH CLAIM FOR RELIEF
### VIOLATION OF THE SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT, S.C. CODE ANN. §§ 39-5-10, *ET SEQ.* (ON BEHALF OF THE SOUTH CAROLINA SUBCLASS)

421. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

422. By reason of the conduct alleged herein, Defendant has violated S.C. Code Ann. §§ 39-5-10, *et seq.*

423. Defendant has entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Business Market for

credit scores, a substantial part of which occurred within South Carolina.

424.    Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Business Market for credit scores, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within South Carolina.

425.    Defendant's conduct was conducted with the intent to deceive South Carolina consumers regarding the nature of Defendant's actions within the stream of South Carolina commerce.

426.    Defendant's conduct was unfair or deceptive within the conduct of commerce within the State of South Carolina.

427.    Defendant's conduct misled consumers, withheld material facts, and had a direct or indirect impact upon Plaintiffs' and members-of-the-Class's ability to protect themselves.

428.    Defendant's unlawful conduct substantially affected South Carolina trade and commerce.

429.    Defendant's unlawful conduct substantially harmed the public interest of the State of South Carolina, as at least thousands of South Carolina businesses purchase FICO Scores.

### THIRTY-SEVENTH CLAIM FOR RELIEF
### VIOLATION OF THE UTAH CONSUMER SALES PRACTICES ACT, UTAH CODE ANN. §§ 13-11-1, *ET SEQ.* (ON BEHALF OF THE UTAH SUBCLASS)

430.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

431.    By reason of the conduct alleged herein, Defendant has violated Utah Code

Ann. §§ 13-11-1, *et seq.*

432.  Defendant entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Business Market for credit scores, a substantial part of which occurred within Utah.

433.  Defendant is a supplier within the meaning of Utah Code Ann. §§ 13-11-3.

434.  Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the business market for credit scores, a substantial part of which occurred within Utah, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Business Market for credit scores.

435.  Defendant's conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Utah.

436.  Defendant's conduct and/or practices were unconscionable and were undertaken in connection with consumer transactions within the meaning of Utah Code Ann. §§ 13-11-3.

437.  Defendant knew or had reason to know that its conduct was unconscionable.

438.  Defendant's conduct misled consumers, withheld material facts, and resulted in material misrepresentations to Plaintiffs and members of the Class.

439.  Defendant's unlawful conduct substantially affected Utah's trade and commerce.

440.  As a direct and proximate cause of Defendant's unlawful conduct, Plaintiffs and the members of the Utah Subclass have been injured in their business or property and are threatened with further injury.

441.  By reason of the foregoing, Plaintiffs and the members of the Utah Subclass

are entitled to seek all forms of relief, including declaratory judgment, injunctive relief, and ancillary relief, pursuant to Utah Code Ann. §§ 13-11-19(5) and 13-11-20.

**THIRTY-EIGHTH CLAIM FOR RELIEF**
**VIOLATION OF THE UTAH UNFAIR PRACTICES ACT,**
**UTAH CODE ALL. §§ 13-5-1, *ET SEQ*.**
**(ON BEHALF OF THE UTAH SUBCLASS)**

442. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

443. By reason of the conduct alleged herein, Defendant has violated Utah Code Ann. §§ 13-5-1, *et seq.*

444. Defendant entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Business Market for credit scores, a substantial part of which occurred within Utah.

445. Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Business Market for credit scores, a substantial part of which occurred within Utah, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Business Market for credit scores.

446. Defendant's conduct caused or was intended to cause unfair methods of competition within the State of Utah.

447. Defendant's unlawful conduct substantially affected Utah's trade and commerce.

448. As a direct and proximate cause of Defendant's unlawful conduct, Plaintiffs and the members of the Utah Subclass have been injured in their business or property and are threatened with further injury.

449. By reason of the foregoing, Plaintiffs and the members of the Utah Subclass

are entitled to seek all forms of relief, including actual damages or $2000 per Utah Subclass member, whichever is greater, plus reasonable attorney's fees under Utah Code Ann. §§ 13-5-14, *et seq.*

**THIRTY-NINTH CLAIM FOR RELIEF**
**VIOLATION OF THE VERMONT CONSUMER FRAUD ACT,**
**9 V.S.A. § 2451, *ET SEQ.***
**(ON BEHALF OF THE VERMONT SUBCLASS)**

450.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

451.     By reason of the conduct alleged herein, Defendant has violated Vt. Stat. Ann. tit. 9, § 2451, *et seq.*

452.     Defendant entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Business Market for credit scores, a substantial part of which occurred within Vermont.

453.     Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Business Market for credit scores, a substantial part of which occurred within Vermont, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Business Market for credit scores.

454.     Defendant's conduct caused or was intended to cause unfair methods of competition within the State of Vermont.

455.     Defendant's unlawful conduct substantially affected Vermont's trade and commerce.

456.     As a direct and proximate cause of Defendant's unlawful conduct, Plaintiffs and the members of the Vermont Subclass have been injured in their business or property and are threatened with further injury.

457. By reason of the foregoing, members of Vermont Subclass are entitled to seek all forms of relief available under Vt. Stat. Ann. tit. 9, § 2451, *et seq.*

**FORTIETH CLAIM FOR RELIEF**
**UNJUST ENRICHMENT**

458. Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

459. As a result of its unlawful conduct described above, Defendant has and will continue to be unjustly enriched by the receipt of unlawfully inflated prices and unlawful profits of FICO Scores.

460. Under common law principles of unjust enrichment, Defendant should not be permitted to retain the benefits conferred on them by overpayments by Plaintiffs and members of the Subclasses in the following states: Arizona, California, District of Columbia, Florida, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

## VIII. PRAYER FOR RELIEF

461. **WHEREFORE**, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully pray that this Honorable Court:

462. Order that this action may be maintained as a class action pursuant to Rules 23(a) and (b) of the Federal Rules of Civil Procedure, that it be named Class Representative, that the undersigned be named Lead Class Counsel, and that reasonable notice of this action be provided to members of the Class as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure;

463. Adjudge that Defendant violated the federal antitrust laws as set forth above;

79

464.     Adjudge that Defendant violated the state antitrust and unfair trade practices laws as set forth above;

465.     Award Plaintiffs and members of the Class actual, double, treble, and exemplary damages as permitted;

466.     Award Plaintiffs and members of the Class pre- and post-judgment interest; Enjoin Defendant from continuing the unlawful actions alleged herein;

467.     Award Plaintiffs their attorneys' fees and all other costs reasonably incurred in prosecution of this action; and

468.     Award such other relief as it deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demands a Trial by Jury as to all issues so triable.

May 29, 2020                               Respectfully submitted,

/s/ Carol V. Gilden
Carol V. Gilden
Cohen Milstein Sellers & Toll PLLC
190 South LaSalle Street ● Suite 1705
Chicago, IL 60603
(312) 357-0370
IL Bar No. 6185530
cgilden@cohenmilstein.com

Brent Johnson (*pro hac vice* forthcoming)
Daniel McCuaig (*pro hac vice* forthcoming)
Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW ● Fifth Floor
Washington, DC 20005
(202) 408-4600
bjohnson@cohenmilstein.com
dmccuaig@cohenmilstein.com

Michael Eisenkraft (*pro hac vice* forthcoming)
Christopher Bateman (*pro hac vice* forthcoming)
David O. Fisher (*pro hac vice* forthcoming)
Cohen Milstein Sellers & Toll PLLC
88 Pine Street, 14th Floor
New York, NY 10005
(212) 838-7797
meisenkraft@cohenmilstein.com
cbateman@cohenmilstein.com
dfisher@cohenmilstein.com

Aubrey H. Tobin
Aubrey H. Tobin Attorney at Law, P.C.
2140 Walnut Lake Road
West Bloomfield Township, MI 48323
(248) 932-3070
aubrey@tobinpc.com

*Attorneys for Plaintiffs Alternative Finance, Inc.,
Brookfield Management Co., and the Proposed
Class*